Tyrone **KENION**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 6354.

District of Columbia Court of Appeals.

Argued Aug. 9, 1972.

Decided March 29, 1973.

Edward T. Kehoe, Washington, D. C., for appellant.

Barry Estrin, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before REILLY, Chief Judge, and KELLY and PAIR, Associate Judges.

PAIR, Associate Judge:

After a trial by the court, appellant was found guilty of carrying on November 24, 1971, a pistol without a license [1] and because he was a third-time offender he was sentenced to a term of not less than three years and not more than nine years. On appeal he makes several claims of error. We reach only one—the contention that his motion to suppress as evidence the pistol should have been granted. We agree and reverse.

1. D.C.Code 1967, § 22–3204.

At the hearing on the motion to suppress, the Government's only witness was Officer Horan, the arresting officer, who at that time was assigned to a "casual clothes unit" of the Metropolitan Police Department. His testimony was that at approximately 3:30 p. m., accompanied by two other police officers, he was driving his private automobile in a southerly direction in the 1800 block of 13th Street, N.W. As the automobile passed an alley running alongside the Whitelaw Hotel on the southeast corner of 13th and T Streets, he " . . . observed three gentlemen standing in the alley appearing to be engaged in some sort of meeting or conference of some kind. Two of the gentlemen were standing off to one side, while the other . . . was facing them. It was snowing and raining very hard and I immediately became curious as to why people would engage in a meeting in such inclement weather."

Officer Horan turned into another alley which ran parallel with the one in which he had just observed the three men and, after proceeding a short distance, encountered—much to his surprise—two of them walking towards the automobile in which the officers were riding. Officers Horan and Love got out of the car, approached appellant and his companion, displayed their badges and identified themselves. Officer Horan then—and for the first time—recognized appellant as a man he had seen before in the neighborhood, and whom he believed had a record for narcotics and robbery. He did not, however, know appellant's name. Before engaging appellant in conversation, the officer performed a *Terry* frisk, during which he felt a hard bulge which proved to be an unloaded .32-caliber pistol.

The Government, over objection, elicited from the officer that the locale was one characterized as "the heart and center for vice activity within [the third] district." Further testimony by Officer Horan was that the circumstances led him to believe that a possible robbery was in progress. However, on cross-examination the officer stated, "I couldn't think for certain of any one thing. It was just suspicious circumstances." Later the officer testified that when he stopped appellant he did not believe appellant had committed or was committing any felony.[2] While the officer had testified that he had seen appellant perhaps a dozen times and had previously stopped him, he could not remember when because "I stop dozens of people daily." Appellant's version of the incident comported substantially with that of the officer, except that he stated that he had not previously been stopped by the officer.

Whatever view we might take of appellant's credibility is of no consequence for the trial court chose to believe the officer, and credibility is for the trier of facts. *Cooper v. United States*, D.C.App., 248 A.2d 826 (1969). The only question presented therefore is whether, accepting the testimony of the officer in its entirety, there existed the " . . . specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, at 21, 88 S.Ct. 1868, at 1880, 20 L.Ed.2d 889 (1968). *See also Gray v. United States*, D.C.App., 292 A.2d 153 (1972).

We recognize at the outset that while any question as to when a *Terry* stop-and-frisk is warranted is perplexing and not subject to a mathematical formula, the touchstone is always one of reasonableness. However it is basic, as pointed out by Mr. Justice Brennan speaking for the Court in *Davis v. Mississippi*, 394 U.S. 721, at 726–727, 89 S.Ct. 1394, at 1397, 22 L.Ed.2d 676 (1969), that:

Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed "arrests" or "in-

---

2. It does not appear from the record that the officer had a report of a robbery in the area, or that he was investigating any criminal act.

vestigatory detentions." We made this explicit only last Term in Terry v. Ohio (citation omitted) when we rejected "the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search.'" [Footnote omitted.]

In our view the action of the police officer in this case cannot be justified as reasonable on any Fourth Amendment ground. There had been no report of a crime and it is difficult to understand how the action of appellant, as described by the officer, could have given him reason to believe that appellant was possessed of a weapon or that a crime had been committed or was in the process of commission.

█ The incident occured at 3:30 p. m. and, although the weather was inclement,[3] it was not an unusual hour for a citizen to be abroad. And even though the area may have been a "center for vice" within the "high crime area" concept, that fact, without a great deal more, would not support an inference that appellant was engaged in criminal conduct. *Cf.* Gray v. United States, *supra.*

█ All that remains, therefore, to justify the police action is the officer's belief that appellant was possessed of a criminal record. The Government has cited no case and we have found none which countenances an invasion of a person's fourth amendment rights upon a showing, without more, of a police officer's good faith belief that such person had a criminal record. *Cf.* Beck v. Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

█ The conclusion is thus compelled that the police officer was not possessed of the articulable facts mandated by Terry v. Ohio, *supra,* as a condition precedent to the frisk of appellant and the seizure of the pistol from his person.

The observation of Judge Nebeker (concurring) in Gray v. United States, *supra,* is equally relevant here:

We have come too far in law enforcement and police-community relations. to permit officers to be so untrained in the basic law as to operate on the misapprehensions revealed herein . . . . Moreover, we cannot fail to recognize that the continued vitality of . . . Terry . . . rests on the assumption that law enforcement will sparingly use and apply police power recognized in that decision and not attempt to disguise harassment in its mantle. . . .

It follows that the pistol seized was the fruit of an illegal search and should have been suppressed.

Reversed.

REILLY, Chief Judge (dissenting).

In my opinion, the trial court on the evidence before it was warranted under the holding in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in sustaining the legality of the seizure of the pistol. Consequently, I regard this reversal of appellant's most recent conviction as unjustified expansion of the exclusionary rule, going beyond anything required by the precedents of this court or of any controlling Supreme Court decision.

With two of the observations in the majority opinion I am in agreement, *viz.,* that (1) since questions of credibility are for the trier of facts, we must accept—as the trial court apparently did—the "testimony of the [arresting] officer in its entirety" and (2) in determining "when a *Terry* stop-and-frisk is warranted . . . the touchstone is always one of reasonableness." In all deference to my colleagues, it seems to me that they have failed to apply these guidelines to the facts developed in this record.

3. The misfortune of being caught in bad weather is one to which all citizens are prey, and we can see little weight to attach to such circumstance.

Officer Horan, who undertook the search and seizure now challenged by appellant, has been a policeman for three years. During the 17-month period immediately preceding the trial, he had been assigned to a plainclothes detail in the Third Police District, to be on the watch to deter such major crimes as robbery, burglary, and felonious assault in a section of the city described by him as a "high crime area." Judicial notice may be taken that this characterization of the Third District is anything but exaggerated, for daily police reports from that area disclose that holdups of shops, housebreaking, mugging of pedestrians, and assaults upon women, are commonplace occurrences. To curb the frequency of such incidents, the police department has found it necessary not only to increase the number of uniformed patrols there but to supplement their efforts with special details of plainclothesmen operating on foot or in unmarked cars, such as the one to which Horan was assigned. Obviously such details would serve no useful purpose unless they were alerted to investigate unusual street gatherings and to take particular notice of the comings and goings of known underworld characters.

The *Terry* decision makes it clear that a policeman may stop and question individuals he encounters on the street, even though probable cause for arrest is lacking, if he has reason to suspect they may be up to some illegal activity. In Munn v. United States, D.C.App., 283 A.2d 28 (1971), this court held that mere furtive behavior by a pedestrian in the presence of a policeman justifies the latter in stopping him. Certainly a gathering of three men in an alleyway in the circumstances depicted by the arresting officer in his testimony, is a "specific and articulable fact" which might well have given rise to some suspicion of projected illegal conduct. At the time the officer noticed the group, a driving rain and snowstorm which had sent all other foot passengers scurrying was in progress.[1] Any casual passerby—let alone a trained police officer—might well have been curious as to why this trio preferred to confer in an alley under uncomfortable weather conditions rather than to use the lobby of a hotel situated in the next block, unless the topic under discussion was too clandestine for them to run the risk of being overheard. The majority opinion implies that any inference that the purpose of the gathering was the planning of a robbery or burglary was unreasonable. It must be remembered, however, that in a typical month in 1971 an average of 30 robberies and 10 felonious assaults were committed each day in the District[2]—the bulk of them within this milieu. Hence the policeman's apprehension that the conferees might have been arranging some kind of illegal undertaking seems no more farfetched than the inference of a potential break-in in the *Terry* situation—an inference based on nothing more than the presence of two loiterers, joined by a third, conversing outside a store and occasionally looking at the display window. In any event, *Terry* does not require that a police officer's right to stop a stranger for questioning depends upon observation of conduct obviously of a criminal nature. Behavior unusual enough to plant the seeds of suspicion in the mind of a trained police observer suffices.

Thus I can perceive nothing in the set of circumstances described in *Terry* which even remotely implies that the officer here acted improperly when he got out of his car to stop appellant for questioning. As

1. Contrary to an observation in a footnote to the majority opinion, there is not the slightest suggestion in the record that the conferees had been overtaken by a sudden downpour, for the officer's description of the deserted streets indicates that the storm had been in progress for some time.

2. Annual Report of Metropolitan Police Department, 1971, page 18. Obviously some incidents which might go unnoticed in another setting may have sinister overtones in this area of the city.

in *Terry*, 392 U.S. at 28, 88 S.Ct. at 1883, "[a]lthough the trio had departed the original scene, there was nothing to indicate abandonment of an intent to commit a robbery at some point."

The real issue is whether the frisk for weapons overstepped the *Terry* bounds upon police conduct. According to *Terry*, such a search and frisk is proper if the officer has grounds for believing the person he is about to interrogate is "armed and dangerous." Neither in this case nor in *Terry* did the officer propound questions before patting down the suspect. In this particular instance the person stopped —*i. e.*, the appellant—had been convicted several times for such offenses as robbery, housebreaking, and larceny. At the time of his arrest new charges were pending against him for unlawful entry, receiving stolen goods, and possession of implements of a crime. While the officer had not actually seen appellant's arrest file prior to accosting him on this particular day, the testimony discloses that the officer did recognize appellant as a man convicted of robbery and other crimes. He had had occasion to question him on the street before, and knew him by face if not by name.

If one knows the occupation of a stranger, it is not unreasonable to think that he might be carrying the tools of his trade with him, *e. g.*, a slide rule in the pocket of a civil engineer, a thermometer in the handbag of a visiting nurse. In *Terry*, the Court observed (392 U.S. at 23, 88 S.Ct. at 1881): "The crux of this case, however, is not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons . . . . " Certainly the officer's knowledge that the man approaching him was an often convicted robber was a "specific and articulable fact" justifying the surmise that he might well be carrying a gun with him —that being one of the essential tools of his trade.[3]

Hence the justification for the pat-down for weapons prior to interrogation was considerably stronger than the identic protective action approved by the Supreme Court when undertaken by the *Terry* officer. There the only reason assigned for thinking the officer warranted in his belief that the suspect was "armed and dangerous" was the fact that the person frisked was one of the trio acting suspiciously in the vicinity of a store window—the same "articulable" fact given for his temporary detention for questioning. Unlike the instant case, the frisking officer in *Terry* knew nothing about the suspect's background. Here, we have two rather

---

3. Defense counsel on cross-examination attempted to discredit the officer's direct testimony to the effect that although he could not remember appellant's name when he stopped him, he recognized him as a man previously involved with narcotics and robbery charges (Tr. 11, 12) with whom he had previously talked in this vicinity. The officer testified that he had seen Kenion on the street at least a dozen times (Tr. 16), and had stopped him once or twice. On cross-examination he said that he knew Kenion had had a criminal record, because in his notebook about stops, it was his practice subsequently to check on the telephone the names of detainees for criminal records (Tr. 19), even though he had no specific recollection of what police official he had checked with (Tr. 19), or of writing Kenion's name in his notebook (Tr. 20). Although he had never actually seen Kenion's official record (Ex. 2 at 27–28) prior to his arrest, his original testimony that he had learned some highlights of it by a telephone check (Tr. 30) was neither contradicted nor retracted (Tr. 31, 32, 33). Apparently in some prior report, P.D. 163, the officer said that at the time of their crucial encounter, he had knowledge of "numerous gun and robbery charges" (Tr. 64). Even though the defense tried to use this to discredit the officer's testimony, it is obvious that a knowledge of a robbery conviction would create the logical inference that the robber in all probability used a gun.

than one "articulable" facts—a suspicious gathering in an alley which warranted interrogation, and a subsequent recognition of a notorious criminal. In short, the case we are reviewing is an *a fortiori* example of the applicability of the *Terry* doctrine.