Leon C. PAYNE (No. 83–1552), Michael D. Mozee (No. 84–432), Ronald E. Davis (No. 84–433), Santonio F. Diggs (No. 84–549), and Frederick L. Edwards (No. 84–588), Appellants,

v.

UNITED STATES, Appellee.

Nos. 83–1552, 84–432, 84–433, 84–549 and 84–588.

District of Columbia Court of Appeals.

Argued Jan. 7, 1986.
Decided Oct. 15, 1986.

Steven R. Kiersh, Washington, D.C., appointed by the court, for appellant Payne.

Michael Olshonsky, Washington, D.C., appointed by the court, was on brief, for appellant Mozee.

P. Scott Dufault, appointed by the court, for appellant Davis.

Allie Sheffield, Public Defender Service, with whom James Klein and Mark S. Carlin, Public Defender Service, Washington, D.C., were on brief, for appellant Diggs.

Karen Knopp O'Konski, Washington, D.C., appointed by the court, for appellant Edwards.

John M. Facciola, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and ROGERS and STEADMAN, Associate Judges.

PER CURIAM:

These consolidated appeals arise from the joint trial of five codefendants: Leon C. Payne, Michael D. Mozee, Ronald E. Davis, Santonio F. Diggs, and Frederick L. Edwards, on armed robbery charges.[1] Two defendants, Diggs and Mozee, were also charged with obstructing justice.[2] The jury found each of the five defendants guilty as charged.[3] All five now appeal their respective convictions, raising various claims of error. Specifically, Payne, Edwards and Diggs argue that the trial court erred in denying their motions, made during trial, to sever their cases from their codefendants, and that the evidence presented at trial was insufficient to support their guilty verdicts. In addition, Edwards argues that the trial court committed reversible error in refusing to give a requested version of a jury instruction on the use of "other crimes" evidence, and in refusing to give a requested "Telfaire"[4] instruction. Davis claims the trial court erred in refusing to admit certain testimony of one alibi witness, and in quashing the subpoena of a Washington Post newspaper reporter. Mozee and Diggs contend that,

---

1. D.C.Code §§ 22-2901, -3202 (1981).

2. D.C.Code § 22-703 (1981).

3. In addition, each of the five defendants was charged with one count of assault with intent to commit robbery while armed, D.C. Code §§ 22-501, -3202 (1981), but the trial court dismissed this charge against all defendants at the close of the government's case.

4. *Telfaire v. United States,* 152 U.S.App.D.C. 146, 469 F.2d 552 (1972).

in light of this court's recent opinion in *Stoney v. United States*, 494 A.2d 1303 (D.C.1985), their convictions for obstruction of justice must be reversed. Lastly, Diggs maintains that the trial court erred in denying, without a hearing, his motion for a new trial. Upon consideration of all of these issues, we find no reversible error arising from any of these claims, and therefore, we affirm appellants' convictions.

## I. *Factual Background*

The government's evidence showed that on the evening of January 12, 1982, five individuals, later identified as appellants, robbed a combination service station and convenience store, located at 5670 Central Avenue in Southeast Washington, owned by Harold and Gloria Kim. Both Mr. and Mrs. Kim were present in the establishment at the time of the robbery. The evidence revealed that, during the course of the robbery, some of the robbers operated inside the store and others stood outside.

Mr. Kim testified that at approximately 8:45 p.m., he and an employee, Anthony Carver, were moving merchandise from the office to the sales area, when Mr. Kim heard a man say, "Everybody out." Mr. Kim looked up and saw three men inside the service station announcing a robbery and ordering the other customers out of the store. One of the robbers put a shotgun to Mr. Kim's chest, while a second gunman, later identified as appellant Mozee, pointed a handgun at Mr. Kim's face and demanded money. When Mr. Kim appeared to resist, Mozee struck him in the face with the handgun, causing a wound that bled profusely and that ultimately had to be closed by four stitches. While Mr. Kim sat on the floor holding his head, Mozee removed approximately $500 from Mr. Kim's pocket. Mr. Kim watched as Mozee then removed an unspecified sum from the cash register. Mrs. Kim, who had

been standing behind the cash register when the robbers first entered, testified that she hid on the floor underneath the shelf of the garage lift, as she saw one of the robbers approaching the cash register. Both Mr. and Mrs. Kim watched the robbers flee out the door.

The day after the robbery, Maurice Robinson, a thirteen-year-old youth who lived in the neighborhood and who knew the Kims, came to the service station. Claiming he had witnessed the robbery, Robinson wrote down for Mr. Kim the names of five men whom he alleged were the robbers. The names on Robinson's list belonged to the five appellants. At Mr. Kim's request, Robinson also borrowed Mr. Kim's Polaroid camera and brought back photographs of appellants Payne and Davis. Mr. Kim shared this information with Detective Leo F. Spriggs, the police officer investigating the robbery.

Another neighborhood youth, Shawn Horn, also came to Mr. Kim shortly after the robbery with information about the perpetrators. Horn claimed to have witnessed the robbery from behind some bushes near the Kim's service station. Like Robinson, Horn also gave Mr. Kim a list with names or nicknames of the alleged robbers. Horn's list contained the same names or nicknames as those on Robinson's list.

In the weeks that followed, Mr. and Mrs. Kim on two separate occasions spotted members of the group that had robbed them in their store. The first time, Horn was present in the station when Mr. Kim saw Mozee approach. Horn knew Mozee by name and ultimately identified for the police the house where Mozee lived. Several days later, Mrs. Kim recognized another one of the robbers, later identified as appellant Davis, when she saw him in the store buying merchandise.[5] Mr. Kim called the police, who arrested Davis after Mr. Kim identified him as one of the robbers.

---

5. According to Mrs. Kim, this was her second post-robbery sighting of Davis. Approximately one week after the robbery had occurred, Mrs. Kim spotted Davis in the store. Davis left, however, before Mrs. Kim could contact the police.

Approximately two weeks after the robbery, Mr. Kim identified appellant Mozee from a photo array. Thereafter, in a series of separate lineups, Mrs. Kim identified Davis as one of the assailants,[6] and Mr. Kim identified Mozee, and then Diggs, as perpetrators of the robbery. In addition, Mrs. Kim made in-court identifications of Mozee, Diggs, and Davis. Mr. Kim, however, did not make any in-court identifications.

The government's main witnesses, in addition to the complainants, were Maurice Robinson, Shawn Horn, and Detective Spriggs.

Maurice Robinson testified that on the night of the robbery, he saw the five appellants walking down the hill which leads toward Mr. Kim's service station. He recognized appellants, whom he had known for a couple of years from the neighborhood, by the distinctive way in which they walked. As he stood near a liquor store across from the Kims' station, he saw Edwards, who was armed with a short shotgun, and Mozee run behind the store's counter and "stick up" Mr. and Mrs. Kim. Robinson stated that he watched appellants "take the Kims' money" and then run back up the hill toward 57th Street.

Robinson also testified that in January of 1982, shortly after he gave Mr. Kim the Polaroid photographs of Davis and Payne, those two appellants approached him separately and told him to retrieve the pictures. Thereafter, Davis came up to Robinson in an arcade one day and told Robinson that "if he didn't give the pictures back[,] he would hit [him]," and indeed threw Robinson against the window of the arcade. Robinson testified further that a few days before trial, appellant Mozee instructed Robinson that when testifying, he should say that he had not seen Mozee "do nothing."

On cross-examination by Diggs' attorney, however, Robinson recanted his testimony with respect to the events surrounding the robbery. Robinson claimed that he had provided information about the robbery only to get money and that he did not see anything happen at the Kims' service station on the night of the incident. On redirect, the prosecutor tried but was unable to rehabilitate Robinson's earlier testimony on direct examination.

Shawn Horn testified[7] that on the night of the robbery he witnessed the events from behind some bushes approximately twenty feet from the service station. Horn indicated that he was able to see the robbers' faces as they entered and left the service station. He stated that he saw Edwards pass a gun to Payne, and saw Davis pass a bag to Edwards. He watched as the robbers ran away from the station and up the hill.

Horn also testified that within a month after the robbery Mozee and Diggs threatened him in connection with his participation in the robbery investigation. According to Horn, the two appellants "came up to me and asked me what I was goin' to court for, [and they] tell me what they was gonna do to kick my butt." When he and Mozee met on two other occasions, according to Horn, Mozee acted as if he were preparing to hit Horn.[8] Finally, Horn testified that a few weeks before the trial was set to begin, Davis asked Horn to tell Davis' attorney that Davis was not involved in the robbery.[9]

---

6. At a different lineup, Mrs. Kim initially identified Mozee as one of the robbers, but then appeared to change her mind and selected someone else in the line.

7. Both Robinson and Horn identified all five appellants in court.

8. It was these incidents that formed the basis for the obstruction of justice charges against Mozee and Diggs.

9. On the second day of his testimony, Horn also testified that while he was on the stand the previous day, a boy named "Kevin" mouthed a threat to him. "Kevin" was never identified conclusively, and his relationship to anyone else connected with the case was never established.

Neither Mozee, Edwards, nor Payne presented any evidence. Davis, however, presented an alibi defense and testified on his own behalf, while Diggs called other witnesses to impeach the government's witnesses.

## II. *Severance*

Edwards, Payne and Diggs[10] each contend that the trial court erred in denying their respective motions for severance. With the exception of Diggs, appellants first raised their severance motions during trial in response to the government's proffer that Maurice Robinson would testify concerning threats made against him by some of the defendants. The trial court denied all three motions, ruling that the evidence about the threats was admissible on the grounds that its probative value outweighed any prejudicial effect it might have.[11] Diggs had previously filed a pre-trial motion to sever his trial. In that motion, Diggs contended that severance was warranted because the evidence against him was *de minimis* as compared with his codefendants, and his defense was irreconcilable with theirs. The trial court denied that motion as well. Later in the trial, Edwards and Diggs renewed their severance motions after Payne's attorney disclosed that while a bench conference was taking place the previous day, Payne had made an ambiguous gesture toward Maurice Robinson, as Robinson sat on the witness stand. The trial judge responded that he too had seen Payne's gesture and had interpreted it as non-threatening.[12] Accordingly, he again denied the severance motions.

Payne and Edwards renewed their severance motions once more in response to the prosecutor's request, during a bench conference, that she be allowed to ask Ms. Marcelia Thompson, a witness on behalf of appellant Davis, whether Thompson had threatened Shawn Horn a few days before trial. Ruling that this question went to the issue of Thompson's bias, and if properly asked would not prejudice the defendants, the trial court allowed the question, and again denied the severance motion.

■ On appeal, appellants acknowledge, as they must, the well-established presumption in favor of trying together defendants charged with jointly committing a criminal offense. *See, e.g., Robinson v. United States,* 452 A.2d 354, 358 (D.C.1982). Nevertheless, in different but related arguments, Edwards, Payne and Diggs now charge that they did not receive a fair trial since, as a result of being tried jointly, they were prejudiced by the evidence concerning threats by their codefendants toward witnesses.

■ It is well established that this court will reverse the denial of a motion for severance only upon a clear showing that the broad discretion accorded the trial court in this regard has been abused. *See, e.g., Brooks v. United States,* 448 A.2d 253, 257 (D.C.1982). To demonstrate that the trial court abused its discretion in denying their severance motions, appellants must show not simply that they were prejudiced but that they suffered "manifest prejudice" from the joinder of their cases. *See Christian v. United States,* 394 A.2d 1 (D.C.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). Appellants have not made such a showing. Ac-

10. Diggs adopts the arguments of Payne and Edwards on both the severance and sufficiency issues.

11. Despite the proffer that Robinson's testimony implicated all five defendants, Robinson ultimately claimed that he could not recall what threats, if any, were made by Diggs, and denied having had any "conversation" with Edwards.

12. The trial judge stated:

I saw something. I thought it was the time I left the witness in the seat [during a bench conference] rather than have him go down. I thought your client [Payne] had indicated something about he was supposed to go down. I think I saw that myself, and I did not interpret it as anything threatening. I thought your client was trying to help the Court run the courtroom.

cordingly, we find their claims unpersuasive.

The thrust of Edwards' argument is that because he was neither charged with obstruction of justice nor implicated in any of the testimony concerning threats and intimidation, he was unduly prejudiced by the admission against his codefendants of evidence of their various attempts to harass and intimidate Horn and Robinson. He alleges that such evidence had a "spillover" effect on his guilt or innocence. In other words, he complains that due to the nature of the evidence and the method of its presentation, the jury was encouraged to believe that all the defendants collectively threatened and intimidated the witnesses. Payne makes a similar argument with respect to the testimony of Marcelia Thompson.

■ Our review of the record reveals that the government, both in presenting its case and in its arguments to the jury, carefully segregated the evidence as to each defendant. In addition, the trial court gave cautionary instructions to the jury on the use of all the evidence, and in particular the testimony about the threats. Thus, we believe any potential "spillover" was minimized, and appellants were not manifestly prejudiced by the joinder.

■ It is accepted that in any trial involving multiple defendants, some amount of potential prejudice is permissible if outweighed by considerations of economy and expedition in judicial administration. *See Davis v. United States*, 367 A.2d 1254 (D.C.1976), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 114 (1977). As we stated previously, only where manifest prejudice will prevent a defendant from receiving a fair trial should severance be ordered. *Baxter v. United States*, 352 A.2d 383, 385 (D.C.1976); *see United States v. Bright*, 630 F.2d 804, 813 (5th Cir.1980).

■ It is also well established that a defendant does not suffer "compelling prejudice" merely because a significant portion of the government's evidence admitted at trial is applicable only to his codefendants. *See, e.g., United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 264, 88 L.Ed.2d 235 (1985). This is so even though some of the evidence concerns prior criminal offenses or bad acts relating only to other codefendants. *See, e.g., United States v. McClure*, 734 F.2d 484, 492 (10th Cir.1984); *see also United States v. Scaife*, 749 F.2d 338, 345 (6th Cir.1984). Otherwise, joinder would be impossible anytime the charges against each of the codefendants were not identical or any time the government wanted to produce evidence that incriminated only one codefendant in a multiple defendant trial. Accordingly, in reviewing a motion for severance, the trial court's role is not to balance on a scale the comparative weights of the evidence as to each defendant. Rather, the key inquiry is whether the evidence presented is so complex or confusing that the jury would be unable both to follow the court's limiting instructions and to make individual determinations about the guilt or innocence of each defendant. *United States v. McClure, supra*, 734 F.2d at 492.

In the instant case, efforts were made throughout trial by the government, the trial judge, and the defense to segregate the evidence as to each defendant. With respect to the threats made against him, although Robinson initially stated that he had "conversations" with all of the defendants, he specifically denied—only a few moments later—that he ever had such a "conversation" with Edwards. Similarly, Horn's testimony about threats was confined to the actions of Mozee and Diggs, and Edwards' name was never mentioned in this regard. During closing argument, the government never once suggested that Edwards participated in any way in the obstruction incidents. Moreover, the prosecutor carefully segregated the evidence of threats against Robinson from the evidence of threats against Horn, emphasizing again that only Mozee and Diggs were involved in the Horn incident. Significantly, Ed-

wards' counsel had and utilized opportunities on cross-examination and in his closing statement to argue Edwards' lack of involvement in any attempts to harass witnesses. Defense counsel for Payne also emphasized in his closing argument that the evidence as to each defendant was "different" and that Payne had to be adjudged only on evidence specifically implicating him.

■ Finally, the trial court gave explicit cautionary instructions to the jury on the use of the evidence. Thus, the court instructed that evidence of "conversations" Horn and Robinson had with Diggs, Mozee, Payne and Davis were only admissible to consider

whether or not they tend to show a defendant's consciousness of guilt, or an identity of a person who committed the crimes ... charged.

Should the jury find that such statements were made,

[the statements] only [may] be held in this regard against the person who said it and not any other defendant in the trial.[13]

Similarly, in advising the jury on the elements of the substantive offense of obstruction of justice the court reminded the jury that the obstruction charges were only to be considered against Diggs and Mozee. Finally, the court instructed the jury to

give separate consideration and return separate verdicts with respect to each defendant as to each count that applies to it. Each defendant is entitled to have his guilt or innocence, as to each of the crimes charged, determined from his own conduct and from the evidence which applies to him, as if he were being tried alone.

Guilt or innocence of any one defendant of any of the crimes charged should not, in and of itself, control or influence your verdicts as to the other defendants....

Where certain evidence was admitted only with respect to a particular defendant, *for example, the alleged conversation,* and not admitted against any other defendant, you may consider such testimony only with respect to the defendant against whom it was offered. You must not consider it in any way in your deliberations with respect to any other defendant. [Emphasis added.]

■ Moreover, the evidence about the threats was not so complex or confusing that the jury would have been unable to attribute it to the proper defendants instead of cumulating it against all of the defendants. In this regard, Robinson's and Horn's testimony linked specific defendants with specific conduct. Thus, while Edwards and Payne may have suffered a minimal amount of prejudice from the joint trial, they did not suffer the kind of "manifest prejudice" which necessitates severance.[14]

---

**13.** Edwards now argues that this instruction would have been more effective in minimizing any prejudice arising from his joint trial had the trial court expressly mentioned Edwards' name as someone *not* having been implicated by the evidence of the threatening statements. Instead, the trial court listed the names of the four defendants who *had* been implicated by those statements. In refusing appellant's request for his own version of this instruction, the trial court stated that the instructions as given sufficiently tended to minimize any potential spillover effect onto Edwards from the intimidation evidence; any further distinctions between Edwards and his codefendants could be drawn by defense counsel in closing argument.

Viewing this instruction in the context of the trial court's whole charge to the jury, we find that it effectively highlighted to the jury their duty to segregate the evidence on this subject according to each individual defendant. *See Charles v. United States,* 371 A.2d 404, 408 (D.C. 1977). Thus, we cannot say that the trial court erred in denying the requested modification to the instruction.

**14.** In a related argument, Payne challenges the trial court's ruling admitting Robinson's testimony about the threats made against Robinson by Payne and Davis. Payne argues that the testimony's prejudicial impact outweighed any probative value it might have had. Over appellants' objection, the trial court ruled that Robinson's testimony was admissible both (1) as *Drew* evidence, *see Drew v. United States,* 118 U.S. App.D.C. 11, 331 F.2d 85 (1964), and (2) as

■ Additionally, Edwards, Payne and Diggs argue that severance was warranted because the evidence presented against each of them was *de minimis* as compared to the evidence presented against their co-defendants. We reject this argument as well.[15]

■ While the evidence introduced against Payne and Edwards was admittedly less substantial than that introduced against Diggs, Davis and Mozee, we cannot say that the weight of the evidence of Payne's and Edwards' complicity in the robbery was *de minimis*. *See Sweet v. United States, supra.* Both Payne and Edwards were positively identified as members of the robbery group by Horn and Robinson. Robinson also testified that Payne threatened him because of Robinson's cooperation in the investigation of the robbery. Payne and Edwards argue that as opposed to their codefendants, who were identified by Horn, Robinson, *and* the complainants, they were not identified by the complainants. We do not believe that this fact by itself required severance. A "defendant is not entitled to severance merely because the evidence against a codefendant is more damaging than the evidence against him." *Christian v. United States, supra,* 394 A.2d at 21. Moreover, the trial court's instructions to the jury directing the jury to consider the evidence against each defendant separately further minimized any risk of prejudice. Accordingly, we do not find any reversible error in the trial court's repeated denials of severance.

### III. *Sufficiency of Evidence*

■ Next, Payne, Edwards and Diggs each argue that the trial court erred in denying their motions for judgment of acquittal. We find that only Payne and Edwards' claims in this regard merit discussion.[16]

The gravamen of Payne and Edwards' claims is that since neither of them was identified by either Mr. Kim or Mrs. Kim, the only evidence introduced against them

---

evidence tending to show "consciousness of guilt."

Where testimony suggesting other criminal behavior is introduced for a purpose other than to show mere criminal propensity, the decision whether the evidence is admissible is committed to the trial court's discretion, and will not be disturbed absent an abuse of that discretion. *See Hawkins v. United States,* 482 A.2d 1230, 1232 (D.C.1984); *Johnson v. United States,* 452 A.2d 959, 960 (D.C.1982). Upon review of the record, we do not find that the trial court's determination that this evidence was admissible constituted an abuse of discretion. We have previously held that evidence of threats to a prosecution witness is ordinarily admissible for the purposes cited here by the trial court. *Byrd v. United States,* 502 A.2d 451, 452 (D.C.1985); *Gale v. United States,* 391 A.2d 230, 235 (D.C. 1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979); *see also United States v. Monahan,* 633 F.2d 984, 985 (1st Cir.1980); *United States v. Bright, supra,* 630 F.2d at 821; *United States v. Smith,* 629 F.2d 650, 651–52 (10th Cir.), *cert. denied,* 449 U.S. 994, 101 S.Ct. 532, 66 L.Ed.2d 291 (1980).

15. Finally, Payne argues that severance of his trial was warranted because his defense was conflicting and irreconcilable with that of his codefendant, Davis. This claim is wholly without merit.

At trial, Payne's defense was general denial; Davis' defense was an alibi. Payne now argues that Davis' presentation of a "weak alibi" somehow caused the two defenses to conflict. Contrary to this assertion, we find nothing in Davis' presentation of his defense which would have caused the jury to improperly infer guilt of both defendants merely from a conflict in the two defenses. *See Sweet v. United States,* 438 A.2d 447, 451 (D.C.1981); *Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966).

16. Diggs' claim does not present a substantial question for review. With respect to the armed robbery charge, the government's evidence against Diggs was particularly strong. Among other things, Diggs was identified on separate occasions by each of the government's four main witnesses: (1) by Mr. Kim at a lineup, (2) by Mrs. Kim in court, (3) by Robinson from a photo array, and (4) by Horn from a photo array. In addition, his nickname appeared on both Robinson's and Horn's original lists of the alleged robbers. His attempt to harass a government witness in connection with the case—a charge which bore on his guilt of the robbery—was well documented at trial. Diggs does not challenge on appeal the sufficiency of the evidence presented on the obstruction of justice charge.

consisted of the identifications made by Robinson and Horn. They maintain that this evidence is too weak to support their convictions for armed robbery. Although they were identified by both Robinson and Horn, they argue that in reviewing the strength of the government's evidence, Robinson's testimony on direct examination implicating them in the robbery must be disregarded in its entirety because Robinson recanted his story on cross-examination. This would leave only Horn's testimony, which they characterize as inherently unbelievable because of inconsistencies both within his statements and between his version of the robbery and the Kims' version of the crime.[17]

The standard of appellate review of evidentiary sufficiency has been cited many times. This court, recognizing the jury's prerogative to weigh the evidence, determine the witnesses' credibility, and draw reasonable inferences from the evidence presented, may reverse on grounds of insufficiency only if "there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Curley v. United States*, 81 U.S. App.D.C. 389, 392–93, 160 F.2d 229, 232–33, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1512, 91 L.Ed.2d 1850 (1947); *accord Hack v. United States*, 445 A.2d 634, 639 (D.C.1982). In conducting such a review, we must assess the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences to be drawn from the evidence. *McClain v. United States*, 460 A.2d 562, 567 (D.C. 1983); *Blackledge v. United States*, 447 A.2d 46, 49 (D.C.1982). Application of these well-established principles requires that we reject appellants' arguments.

Contrary to appellants' assertions, Robinson's recantation on cross-examination did not make his testimony, directly implicating appellants' in the robbery, in-

credible as a matter of law. Rather, as the trial court correctly noted in ruling on appellants' motions for judgment of acquittal, conflicts created by a witness' recantation, like other internal inconsistencies within a witness' testimony, are factual questions for the jury to resolve. *See, e.g., Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir.), *cert. denied*, 469 U.S. 842, 105 S.Ct. 148, 83 L.Ed.2d 86 (1984); *Green v. United States*, 110 U.S.App.D.C. 99, 99–100, 289 F.2d 765, 765–66 (1961); *Hinton v. United States*, 91 U.S.App.D.C. 13, 14, 196 F.2d 605, 606 (1952); *see also Evans v. United States*, 299 A.2d 136, 139 (D.C.1973).

This is because inconsistencies in witness' statements present questions of credibility, and issues of credibility are committed to the sole and sound discretion of the jury, as the determiners of fact. *See, e.g., Kinard v. United States*, 416 A.2d 1232, 1235 (D.C.1980); *Kenion v. United States*, 302 A.2d 723, 724 (D.C.1973). Specifically, where a witness recants, the trier of fact must decide whether to accept as true the witness' original testimony or revised testimony. As we have previously stated, "witnesses may recant for numerous reasons that have nothing to do with furthering truth or justice." *Godfrey v. United States*, 454 A.2d 293, 300 n. 26 (D.C.1982). Here, the government argues that Robinson recanted at trial out of fear of the defendants. This explanation is supported by the trial record which reflects that, from the very beginning of the proceedings, Robinson behaved in a frightened manner. For example, at a pretrial hearing, it was necessary for the trial judge to issue a bench warrant when Robinson failed to obey a subpoena to appear in court. Evidence was introduced that a number of the defendants, including appellant Payne, threatened and intimidated Robinson and another government witness in connection

---

**17.** Consistent with this characterization of the evidence, appellants maintain that theirs are one-witness identification cases, subject to a "substantial likelihood of irreparable misidenti-

fication" standard of review. Because we do not believe, for the reasons stated below, that this is a one-witness identification case, we do not apply this standard of review.

with the robbery investigation.[18]  Indeed, Robinson's demeanor caused the trial court to characterize Robinson as "one terrified human being [with] fear in every part of his features."  At another point, the court commented that during his testimony Robinson "turned to me with what I can only call ... pleading eyes."

Thus, on the one hand, the jury could reasonably have found that Robinson's recantation was the result of intimidation and chose to ignore it and instead accept Robinson's earlier testimony on direct examination implicating appellants in the robbery. In the alternative, the jury could have rejected Robinson's incriminating testimony as unbelievable in light of his recantation. *See Godfrey v. United States, supra,* 454 A.2d at 300 n. 26 (where circumstances surrounding recantation suggest it is result of coercion, the trier of fact is justified in disregarding it); *see also United States v. Rodriguez,* 573 F.2d 330, 334 (5th Cir.1978). In either case, such a decision belonged to the jury.

For similar reasons, we reject appellants' contention that in assessing the strength of the government's evidence, the trial court was obliged to disregard Horn's testimony at trial because it was incredible as a matter of law.[19]

In *In re A.H.B.,* 491 A.2d 490 (D.C.1985), we articulated the "stringent test" which must be met before the trial court may dismiss a witness' evidence as inherently incredible:

The doctrine of inherent incredibility can be invoked only when the testimony can be 'disprove[d] ... as a matter of logic by the uncontradicted facts or by scientific evidence,' or when 'the person whose testimony is under scrutiny made

allegations which seem highly questionable in light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave.'

*Id.* at 496 n. 8 (quoting *Jackson v. United States,* 122 U.S.App.D.C. 324, 329, 353 F.2d 862, 867 (1965) (footnote omitted)).  *See also Coleman v. United States,* 515 A.2d 439, 444 (D.C.1986).  Under this standard, we cannot say that Horn's testimony viewed in its entirety was "inherently incredible."

■■■  The record shows that Horn was, as appellants describe, a reluctant and hesitant witness.  His answers were slow and sometimes petulant.  The manner in which he answered questions, however, does not make his testimony unbelievable "as a matter of logic."

Indeed, a reasonable explanation for Horn's behavior on the witness stand is provided in the trial court's reflections on Horn's demeanor as a witness.  In ruling on appellants' motions for judgment of acquittal the court observed:

I doubt if any two-dimensional record can ever reproduce how correct it is ... that Shawn Horn has been at times very reluctant to answer questions, sometimes refusing to answer questions, at many times very, very hesitant in answering those questions.  However, he has also told this jury ... that he has been threatened concerning his testimony ... he's told them ... the reason that he has been hesitant....  [Therefore] I cannot say as a matter of law that the jury must find his testimony incredible.  They could accept it as true, balancing out the totality of the circumstances....  If they

18.  Edwards argues that he was not responsible for any of the threats made against Robinson or any other witness and that should somehow bear on this issue.  Notwithstanding appellant's blamelessness, the numerous examples of threats made against Robinson could have caused a reasonable jury to conclude that fear *may have been* the catalyst for Robinson's change of heart on the witness stand.

19.  Appellants raise for the first time on appeal the threshold question of Horn's competency to testify.  They point out that Horn was only fifteen at the time of trial and was a reluctant and at times inarticulate witness.  Because the trial court was never asked to rule on the issue of Horn's capacity, we decline to address it.

were to accept his testimony alone as true ... [they] could rationally conclude that each and every element of ... the offenses has been proven beyond a reasonable doubt.

At other junctures, the trial court noted that Horn looked visibly scared as he testified in court. We are obliged to give great deference to the trial judge's observations in this regard because he was in the best position to observe Horn's demeanor and assess what a reasonable juror observing the same witness and hearing the same evidence might have done. *See Godfrey v. United States, supra*, 454 A.2d at 293. Accordingly, we accept the trial court's observation that Horn's hesitancy on the witness stand could reasonably have been attributable to his fear of the defendants.

Nor do we find that Horn's testimony was inherently unbelievable because it was inconsistent with the testimony of other government witnesses, and was at times, internally inconsistent. It is axiomatic, that as assessors of a witness' credibility, the jury is always free to accept parts of a witness' testimony and reject other parts. *Kinard v. United States, supra*, 416 A.2d

at 1235; *see Kenion v. United States, supra*, 302 A.2d at 724; *Hill v. United States*, 280 A.2d 925, 927 (D.C.1971). Similarly, contradictions among witnesses at trial are inevitable and are matters for the jury to resolve as they weigh all the evidence. *Graham v. Solem, supra*, 728 F.2d at 1541.[20]

In sum, the inconsistencies in both Robinson's and Horn's testimony, and between their testimony and that of other witnesses, were not of such proportion that a reasonable jury drawing reasonable inferences could not have resolved the conflicts, ascertained the truth, and found Payne and Edwards guilty beyond a reasonable doubt. Viewed in its entirety, the government's evidence was sufficient to warrant submission of the case to the jury.[21]

### IV. *Quashing of Subpoena*
#### A.

The Kim robbery attracted some publicity in the media. Indeed, it was the subject of a feature article entitled "Stick Up" in the March 14, 1982 issue of the Washington Post Magazine, written by a Wash-

---

**20.** The record reflects that Horn contradicted himself on whether he jumped into the bushes near the Kims' station before or after the robbery commenced, whether he had worked for the Kims, and whether or not he had given Mr. Kim a list containing the names of the robbers. In addition, contrary to the testimony of the Kims, Horn stated that appellant Diggs stood outside the store as a lookout during the robbery, while appellants Edwards and Payne were inside the store. Mr. Kim and Mrs. Kim had placed Diggs inside the store during the robbery, and neither complainant identified Edwards or Payne as one of the robbers.

Appellants also contend that Horn's and Robinson's testimony that five men perpetrated the robbery contradicts Mr. Kim's testimony that only three men were involved and Mrs. Kim's testimony that four men were involved. Mr. Kim, however, stated that he did not go outside either during or after the robbery. Thus, he would not have been able to see any of the men who were standing outside as lookouts. Mrs. Kim also testified that she was only able to observe what was transpiring inside the store during the robbery. Accordingly, a reasonable jury could have concluded that from their vantage points outside the store, Robinson and

Horn would have been able to observe activity both inside and outside the store including the presence of any "lookouts."

**21.** Edwards' remaining contention is that the trial court erred in refusing to grant his request for a "Telfaire" jury instruction concerning the uses of identification testimony introduced at trial. *See Telfaire v. United States, supra*, 152 U.S.App.D.C. at 146, 469 F.2d at 552. Notwithstanding its view that the case did not present a "one-eyewitness" identification situation, the court offered to instruct the jury according to Criminal Jury Instructions for the District of Columbia, No. 5.06 (3d ed. 1978), instead of the proposed "Telfaire" instruction. Appellant objected arguing that the "Telfaire" instruction better illuminated the "infirmities of eyewitness identifications." The trial court went on to instruct the jury according to Criminal Jury Instruction No. 5.06. This was not error. *See Wilkerson v. United States*, 427 A.2d 923, 927 (D.C.), *cert. denied*, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). Indeed, because appellant was identified by two witnesses, Robinson and Horn, the trial court "was arguably more cautious than necessary in protecting appellants' due process rights." *Id.* at 927–28.

ington Post reporter. The article described the commission of the robbery but its primary focus was the police investigation which followed the crime. On October 21, 1983, approximately one week before trial was set to commence, appellant Davis served a subpoena on the Washington Post reporter in connection with the "Stick Up" article. The subpoena commanded the reporter's appearance in court to testify on behalf of Davis and directed him to bring "copies of any notes used in preparing or made in preparation of the article 'Stickup' written by you and published in [the] March 14, 1982 magazine section of W[ashington] Post." On October 24, 1983, the reporter filed a motion to quash the subpoena, asserting a First Amendment privilege for newsgatherers that protected both himself and the requested materials.

The resolution of the reporter's motion was intertwined with issues concerning the reliability of identifications made by Mrs. Kim of appellant Davis. On July 28, 1983, Davis filed a motion to suppress three pretrial identifications made of appellant by Mrs. Kim, on the grounds that they were unreliable and the product of impermissibly suggestive procedures. The first identification being challenged was made on January 22, 1982, when Mrs. Kim spontaneously identified Davis after he walked into her store. This event was referred to at trial as the "second sighting." [22] Mrs. Kim made the second identification of Davis at a lineup conducted on February 23, 1982, and the third identification from a photo array prepared by Detective Spriggs.

In support of his motion to suppress, Davis contended *inter alia* that the three identifications were "tainted," because prior to the first identification, the so-called "second sighting," Mr. Kim had shown

Mrs. Kim a Polaroid photograph of Davis which had been taken by Maurice Robinson and which purported to depict one of the robbers. As became clear at the pretrial motions hearing, appellant based this allegation on a paragraph in the "Stick Up" article stating that prior to the "second sighting" both Mr. Kim and Mrs. Kim viewed Robinson's photograph of Davis and neither complainant was able to identify any of the robbers from the picture. In its response to Davis' motion to suppress, the government contended that Mrs. Kim had never seen the Polaroid photograph in question.

On October 24, 1983, a hearing commenced before the trial judge on the motion to quash the subpoena. Davis' attorney argued that the motion should be denied because the reporter's testimony and notes went to the "root" of the "crucial question" of identification. According to the defense, in light of the conflict between the government's assertion that Mrs. Kim never saw the Polaroid photograph and the Washington Post alleging that she had seen the Polaroid photograph, the reporter's availability to testify and produce all his notes was necessary (1) to determine whether Mrs. Kim's identifications were tainted by her earlier viewing of Davis' picture and thus, inherently unreliable, and (2) to impeach Mrs. Kim's testimony at trial with a prior inconsistent statement should she testify in accordance with the government's position. After hearing the defense proffer, the trial court decided to hold the motion to quash in abeyance until after a hearing on Davis' motion to suppress was held.

At the suppression hearing, Detective Spriggs, Mr. Kim, and Mrs. Kim all testified about the second sighting identifica-

---

22. It was called the "second sighting" in order to distinguish it from a previous post-robbery sighting of Davis by Mrs. Kim. The first sighting occurred approximately three days after the robbery. While she was alone in the store, Mrs. Kim saw a man she recognized as one of the robbers, enter the store apparently to make a purchase. The man, later identified as Davis,

left, however, before Mr. Kim returned and was able to call the police. The "second sighting" occurred about two to three days later. This time, when Mrs. Kim observed Davis in the store, she immediately notified her husband who contacted the police. Appellant was arrested shortly thereafter.

tion and the Polaroid photograph. On cross-examination, Detective Spriggs stated that while he believed Mrs. Kim might have seen Robinson's photograph of Davis, he had never asked her about it directly. Detective Spriggs could not recall whether he had told the Washington Post reporter that both Kims had seen the Polaroid photograph. Mr. Kim testified that after he received the photographs in question from Maurice Robinson he had them for only two hours before turning them over to Detective Spriggs. Mr. Kim could not remember whether he had shown Davis' picture to his wife. Finally, in her testimony, Mrs. Kim consistently denied ever seeing the Polaroid photograph. She claimed to have learned about the photograph's existence from the newspaper. She stated further that upon reading about the Polaroid photograph she asked her husband: "Why didn't you show me the pictures?"

Before ruling on appellant's motion to suppress, the trial judge resumed the matter of the motion to quash. Specifically, the trial judge viewed the Polaroid photograph of Davis and concluded that "it [was] a very, very poor [photograph] for purposes of seeing someone's face. It's taken at a distance ..., its subject is in shadow and you cannot make out facial features with any clarity whatsoever." Because of the photograph's poor quality, the trial court concluded that even assuming Mrs. Kim had seen the photograph it could not possibly have influenced or "tainted" any later identification she made of Davis.[23] Thus, the court found that any information the Washington Post reporter could provide regarding Mrs. Kim's alleged viewing of the photograph was not "essential to a resolution of this case" and accordingly, was not a sufficient basis for "piercing" the newsgatherer's qualified privilege.[24]

Therefore, the trial court granted the motion to quash the subpoena.

### B.

While the trial court's ruling on the reporter's motion presumed that a qualified privilege for newsgatherers exists under certain circumstances in this jurisdiction, this court has never previously addressed this issue. We need not do so here. The very grounds relied upon by the trial court in refusing to pierce the presumed privilege lead us to conclude, beyond a reasonable doubt, that any error in the presumption of a privilege or its application did not affect the verdict. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[25]

The trial court after hearing the testimony of Mr. Kim, Mrs. Kim, and Detective Spriggs, and, more importantly, after viewing first hand the controversial photograph, rejected appellant's contention that the picture could in any way have influenced or tainted Mrs. Kim's subsequent identifications of appellant. In reaching this conclusion, the trial court observed that the picture was of such poor quality that even if Mrs. Kim had viewed the photograph (which she categorically denied doing) such a viewing could not have affected any subsequent identifications on her part. We too have viewed the photograph in question and cannot say that the trial court's assessment of the picture's relevance constituted an abuse of discretion. Thus, any information that the Washington Post reporter possessed in this instance was not relevant and, accordingly, not essential to a just resolution of appellant's case.

Insofar as appellant wished to use the Washington Post reporter as a

---

23. The trial court also emphasized that it credited Mrs. Kim's testimony when she stated that she had never viewed the photograph.

24. The court went on to deny appellant's motion to suppress the identifications. Appellant does not challenge this suppression ruling on appeal.

25. We assume for present purposes that the test enunciated in the *Chapman* case is applicable. We observe, however, that neither at trial nor on appeal did Davis challenge the existence of some sort of newsgathering privilege, only its scope and application.

witness to impeach Mrs. Kim's credibility with an alleged prior inconsistent statement, under the totality of the circumstances, the deprivation of the right is no cause for reversal. While a defendant is entitled to latitude in presenting evidence tending to impeach the credibility of a witness, such a right is not without limitation. *Washington v. United States*, 499 A.2d 95, 101 (D.C.1985). Thus, the trial court may in its discretion limit cross-examination "into matters having little relevance or probative value to the issues raised at trial." *Springer v. United States*, 388 A.2d 846, 855 (D.C.1978); *see Moss v. United States*, 368 A.2d 1131, 1135 (D.C.1977). This is especially true where the defendant seeks to introduce extrinsic evidence—e.g., contradiction by another witness—to impeach a witness on non-material or collateral issues.[26]

In sum, because the information sought was clearly not material to appellant's case, we cannot say that Davis' right to a fair trial was infringed by the trial court's grant of the motion to quash.[27]

## V. *Obstruction of Justice*

Appellants Mozee and Diggs contend that their convictions for obstruction of justice must be reversed because their alleged conduct was not proscribed by D.C. Code § 22–703 (1981) (repealed Dec. 1, 1982),[28] the statute under which they were indicted and convicted. In support of their argument, they chiefly rely upon our recent decision in *Stoney v. United States*, *supra*. Because the facts underlying the instant case are distinguishable from those presented in *Stoney*, we reject their argument.

Shawn Horn testified on direct examination that in the weeks following the Kim robbery, he was threatened by Mozee and Diggs as he was going home from school one day on his lunch break. According to Horn,

> [Mozee and Diggs] came up to me and asked me what I was goin' to court for, tell me what they was gonna do to kick my butt. I told them I was goin' to court for them.

Horn also testified that on two occasions Mozee acted as if he were preparing to hit Horn.

In *Stoney v. United States*, *supra*, we held that a conviction for obstruction of justice had to be reversed where the basis for the conviction was a bribe to a prospective grand jury witness because a Superior Court grand jury was *not* an "investigator" within the meaning of the obstruction

---

**26.** Also relevant is the fact that two of the defendants, Payne and Edwards, were convicted on the basis of testimony of only two eyewitnesses, Robinson and Horn. (The Kims never identified Payne or Edwards.) Robinson and Horn also gave eyewitness testimony as to Davis, Diggs and Mozee. Mrs. Kim's in-court identification of the latter three was thus essentially cumulative.

**27.** Davis' only other claim on appeal involves his contention that the trial court erred in refusing to admit certain testimony by Ms. Marcelia Thompson, one of Davis' alibi witnesses. The trial court ruled that Ms. Thompson's proposed testimony to the effect that she recalled what she did on the night of the robbery because of something that a third person told her, was hearsay not subject to any exceptions. Based on the nature of the defense proffer, we cannot say that the trial court abused its discretion in rendering this evidentiary ruling. *See McClain v. United States*, *supra*, 460 A.2d at 569.

**28.** Section 22–703 (1981) provides in pertinent part:

> (a) Whoever ... willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats of force, to obstruct, delay, or prevent the communication to an investigator of the District of Columbia government by any person of information relating to a violation of any criminal statute in effect in the District of Columbia ... shall be fined not more than $1,000 or be imprisoned not more than 3 years, or both.

> (b) As used in this section, the term "criminal investigation" means an investigation relating to a violation of any criminal statute in effect in the District of Columbia, and the term "investigator" means an individual duly authorized by the Mayor or his designated agent to conduct or engage in such an investigation.

This section has been repealed and replaced by D.C.Code §§ 22–721, –722 (Supp.1985).

of justice statute. *Id.*, 494 A.2d at 1305. Mozee and Diggs, citing Horn's testimony that appellants threatened him by asking "what I was goin' to court for," argue that "to court" can only be interpreted to mean "grand jury." Because Horn's testimony did not elaborate any other threats made by Mozee and Diggs, appellants argue that pursuant to *Stoney* their convictions must be reversed. We disagree with appellants' position that the phrase "to court" can only be understood to mean "grand jury" in this context. On the contrary, the record reflects alternative meanings to the phrase "to court."

According to the evidence at trial, the threatening incident described by Horn occurred sometime between January 12, 1982 and February 1, 1982, nearly six months before either Mozee or Diggs were arrested. Presumably the grand jury did not ever consider their case for a period after the arrests.[29] Thus, when Mozee and Diggs threatened Horn, neither man knew nor had reason to believe that Horn was scheduled to appear before a grand jury. This case is, therefore, distinguishable from *Stoney* where the evidence showed that the defendant, having learned that a witness had been subpoenaed to appear before a grand jury, offered to pay that witness not to testify. *Id.* at 1304. Indeed, Mozee and Diggs threatened Horn at the very initial stage of the police investigation surrounding the Kim robbery, shortly after Horn had agreed to provide names of the robbers to Mr. Kim and, thus, indirectly to Detective Spriggs. A reasonable jury, therefore, could have interpreted the words "to court" more broadly to mean cooperation with the ongoing investigation being conducted by the police. At the same time, because of the considerable time gap between the making of the threats and the commencement of grand jury proceedings, it seems unlikely that "to court" meant to the grand jury.

Appellants never raised their present arguments questioning the factual basis for the obstruction of justice charges to the trial court. Indeed, the record demonstrates that at trial all parties viewed appellants' threats to Horn as attempts to intimidate Horn from cooperating with the police. Thus, in her opening statement, the prosecutor stated in reference to the obstruction of justice charge: "within a couple of weeks [of the robbery] ... Santonio Diggs and Michael Mozee ... approached [Horn] as if they were going to [hit him] and he ran away, and he will tell you ... that he was afraid to tell the police because of what they had done."

Defense counsel did not characterize the events differently in their own arguments. On the contrary, following the close of the government's case, Mozee's counsel moved for judgment of acquittal on the obstruction of justice charge on the sole ground that the government's evidence was insufficient to show that Mozee's "conversations" with Horn "in any way [prevented Horn from] communicat[ing] with the Government's detectives whenever they were available to question him about this case." Similarly, in his closing statement, Mozee's attorney described the time frame in which the threats were made as occurring after appellants learned that Horn "was working with the Kims," and thus, indirectly with the police, "to develop names to submit to the police so that people could be prosecuted in this," and argued that the impact of these alleged threats on Horn were minimal.

Finally, the trial court's instructions to the jury reinforced the theory that appellant's threats were intended to prevent Horn from cooperating with the police investigation of the robbery. During its instructions to the jury, the trial court advised that one of the essential elements of the crime of obstruction of justice is that "the defendants [have acted] to obstruct, delay or prevent the communication to an

29. According to the indictment charging Mozee and Diggs with armed robbery and obstruction of justice, the charging grand jury was sworn in on October 22, 1982.

investigator of the District of Columbia ... [and] that the communication was of information relating to a violation of the armed robbery statute." The judge went on to define "investigator" as "any individual duly authorized by the Mayor of the District of Columbia ... to conduct or engage in the criminal investigation. A Metropolitan police officer is an investigator within this definition."

■ Absent any evidence, besides the ambiguous phrase "to court," suggesting that appellants' threats were intended to prevent Horn from testifying before the grand jury, and in light of the time sequence in which the threats occurred, the arguments from counsel, and instructions from the trial court, we believe the holding in *Stoney* is inapplicable here.[30] Accordingly, we reject appellant's arguments that their conviction for obstruction of justice must be reversed.

VI. *Motion for New Trial*

Following the trial's conclusion, appellant Diggs filed a motion for a new trial alleging that a new trial was mandated in the "interest of justice." *See* Super.Ct. Crim.R. 33 ("court on motion of a defendant may grant a new trial to him if required in the interest of justice"). Specifically, defense counsel averred that subsequent to the jury's verdict she had learned that several jurors saw one of Diggs' codefendants gesture to Shawn Horn during a bench conference while Horn was on the witness stand. The motion stated further that the jurors interpreted the gesture as a threat, and that they discussed this threat with the other jurors during deliberations. In its response, the government asserted that the motion contained a mistaken factual premise in that while the cited "gesture" had occurred during trial it was made during the testimony of Maurice Robinson and not that of Shawn Horn. Insofar as the trial court had already acknowledged see-

ing the gesture and had found it non-threatening and non-prejudicial, the government argued that Diggs' motion should be denied.

By Memorandum Opinion and Order dated March 5, 1985, the trial judge denied appellant's motion on the grounds that (1) the judge himself had observed the act in question—a gesture by Leon Payne toward Maurice Robinson—and had interpreted it as non-threatening; (2) even if appellant's proffer of "jury taint" were otherwise sufficient, appellant never alleged that the jury used Payne's conduct against Diggs; (3) the motion is conclusory and unsupported by affidavits verifying the allegations; and (4) the evidence against Diggs was substantial. Appellant now argues that the trial court erred in summarily denying his motion. We find appellant's contention to be without merit.

■ The trial court should grant a motion for new trial under the "interests of justice" standard only where exceptional circumstances are shown. *Huggins v. United States,* 333 A.2d 385 (D.C.1975). The decision whether to grant such a motion is committed to the sound discretion of the trial court and will be disturbed only for an abuse of that discretion. *Williams v. United States,* 295 A.2d 503 (D.C.1972). As with other motions of a similar nature, the movant bears the burden of persuasion. *See Bliss v. United States,* 445 A.2d 625, 634 (D.C.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983).

■ In the instant case, the trial court had ruled that appellant Payne's gesture toward Maurice Robinson was non-threatening and could not reasonably have negatively influenced the jury. *See supra* note 9. We cannot say that the court erred in refusing to reopen the matter in the posttrial stage to speculate further into the effect Payne's behavior had on the jury.

---

**30.** Because we find that the *Stoney* holding is inapplicable to this case, we need not decide the retroactive effect, if any, of the *Stoney* decision.

Appellant argues that the trial court should not have concluded, without first holding a hearing, that appellant had made a factual mistake in his motion and that the gesture referred to was the same gesture which the trial court had earlier seen directed at Maurice Robinson. Appellant, however, failed to sustain his burden of making the kind of proffer which would have justified a hearing on the matter. *See Wilson v. United States,* 380 A.2d 1001, 1004 (D.C.1977) (generally trial court may decide motion for new trial without a hearing). His motion was conclusional, and the allegations it contained were not supported by affidavits "disclosing the source of [his] information or verifying the details." *Khaalis v. United States,* 408 A.2d 313, 360 (D.C.), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980). Moreover, once the government filed its response to the motion asserting that there was a factual error, appellant had the responsibility of supplementing the record, either by way of affidavits from the jurors or other means, to establish the existence of a factual question concerning whether there had been one gesture or two. Appellant, however, failed to either supplement or clarify the record despite a substantial period of time in which to do so.[31] *Compare Wilson v. United States, supra,* 380 A.2d at 1004 (holding that denial of motion for new trial without a hearing was abuse of discretion where movant submitted sworn affidavits setting forth details of allegations).

In light of appellant's failure to satisfy his burden in this regard, the trial court's denial of the motion on the basis of the record and the trial court's own recollection of the facts was neither unreasonable nor an abuse of discretion.

*Conclusion*

In sum, we have reviewed all five appellants' allegations and find none of them persuasive. Finding no error in the trial proceedings, we affirm appellants' convictions.

*Affirmed.*

**31.** The trial judge did not rule on appellant's motion for more than one year from the time it was filed.