THOMPSON, Associate Judge:
Appellant Dion Slater-El contends that, the evidence was insufficient to sustain his conviction for attempted second-degree cruelty to children.[1] Concluding that the evidence on which the trial judge primarily relied in finding that appellant caused a grave risk of bodily injury to his young son meets the test of “inherent incredibility” — admittedly a “very stringent test which has been met in only a tiny number of cases-,” In re A.H.B., 491 A.2d 490, 496 n. 8 (D.C.1985) — and that the remaining evidence cannot support a find *533 ing of guilt beyond a reasonable doubt, we agree, and therefore reverse.
I.
Appellant’s conviction stems from an'incident at the home of his sister, Donna Robinson, and her husband, Ellsworth Robinson. Appellant’s wife, Louisetta Koh, lived in the Robinson home along with her two children, a six-year-old daughter and a 16-month-old son. Appellant is the biological father of the younger child. On October 26,2013, after appellant had brought the children back to Koh after their visit with appellant, an argument between Koh and appellant ensued when Koh informed appellant that she had made arrangements to take both children to North Carolina the next day. Appellant said that he would not allow Koh to take his son. When Ms. Robinson saw that appellant and Koh were “tussling,” Ms. Robinson told appellant to leave, but appellant refused and (the trial court found) shoved Robinson aside.[2] The bulk of the testimony at trial was focused on what occurred afterwards, when appellant walked over and picked up his son, who was seated in a highchair.
Ms. Robinson was the government’s first witness. We describe her testimony at some length because the trial court relied on it heavily in finding appellant guilty of attempted second-degree cruelty to children. Ms. Robinson testified that appellant “grabbed” the child, who was “still strapped into” the highchair (depicted in Government Exhibit 2), “grabbed the highchair,” and somehow “ended up on top of ... Koh on the couch with the highchair and the baby[,j” possibly because appellant had tripped over the legs of the highchair. According to Ms. Robinson, appellant “had his arms around the baby” but “also had a full highchair ... in his grasp”; Koh “was under [appellant] and the baby,” while the baby was “still ■ strapped into the ... seat[.]” ■ Ms. Robinson testified that appellant had “a grip on the baby where you really couldn’t see the baby.... You really couldn’t see the baby good, unless you knew the baby was there, you wouldn’t have known that he had that tight of a grip on the baby.”
Ms. Robinson further testified that she and. Koh kept repeating that appellant should “let go of the baby,” and Ms. Robinson tried “to pull him up off the baby.” After a “few minutes,” Mr. Robinson, who had called 911, came downstairs and hit appellant “to get him to let go of the baby,” and there was a “lot of confusion going on at that time.” When the police arrived, Ms. Robinson testified, they “had this baton thing” that Ms. Robinson “guess[ed] [] they were going to poke [appellant] with[,]” but Ms. Robinson told them to stop and joined “[everybody [in] hollering it’s a baby under there, it’s a baby under there.” Ms. Robinson testified that when a. second officer arrived, that officer “was getting ready to mace [appellant],” but everyone again “hollered please don’t use the mace,it’s a baby under there.” The officers tried to pull appellant off of Koh and told him to let the baby go, but appellant “said he wasn’t going to do it,” Appellant eventually, released the baby, but, during the whole time appellant was holding the baby, the baby was “screaming” and “hysterically crying” and “was terrified.” ,
On cross-examination, Ms. Robinson testified that while the highchair was propped up on the couch, appellant had his back *534 toward her and never changed that position until the police came. Ms. Robinson agreed that her view was of appellant’s “back and back of his head” and that she grabbed appellant “from the back,” but said that appellant’s “weight was on— could have — anything could have happened at that moment actually.” She added that appellant “was putting the baby at more harm than had he let the baby go, because [Koh] was also there and she had her hands on the baby, as well.”[3] Ms. Robinson further testified that she didn’t “know what [appellant] could see, because [she] couldn’t see what he could see.”
On re-direct, Ms. Robinson testified that “[appellant’s] weight was on that baby. Even though he may have had the baby wrapped around — he had his arms wrapped around the baby, the positioning of that baby between him and his wife could have caused that baby harm.... The weight of his body was on the baby ... The only thing that I could see that might have even helped a little bit was the highchair. Had the baby not been in the highchair[,] the baby could have gotten really hurt badly.”
The government’s next witness was Mr. Robinson. Mr. Robinson testified repeatedly that he “couldn’t see the baby” and “didn’t see the baby” or the highchair, because appellant was “right over top [of] the baby” and because the baby and Koh were both “down on the floor in front of [appellant].”[4] Mr. Robinson said that appellant “wouldn’t let the baby go even after the police came” and that appellant released the baby only after the police put “a little spoon ... [thing] under his arm” and his arm “popped up.” Mr. Robinson testified that “it didn’t seem like [the police action] hurt the baby” and that he did not hear the baby “do anything.... The baby was walking.”
The government’s final witness was Metropolitan Police Department (“MPD”) Officer Tiffany Keenan, who responded to the 911 call on the night of the incident. Officer Keenan testified that when she and Officer Michael Rodd arrived at the scene, she heard voices yelling, “let go of the baby, get him off of the baby.” Officer Keenan testified that when she entered the residence, she saw appellant “laying on top of’ or “laying over top of the baby and then the baby right under him,” and could see the baby face up and crying “hysterically,]” “like it was very uncomfortable.” Appellant’s torso was “leaning over the couch” and his “knees [were] on the ground.” Officer Keenan then demonstrated appellant’s positioning for the court, which the government described for the record: “[Officer Keenan] kneeled down on the floor bent over[,] encircling her arms in front of her.” Officer Keenan stated that appellant was “more so laying on top of the baby” than cradling the baby. Officer Keenan did not see a highchair and agreed on cross-examination that Koh was not lying under appellant when the officers arrived. Officer Keenan testified that appellant “repeatedly kept saying I’m not going nowhere without my son.” The officers “more than twice” asked appellant to release his son, and, when he would not comply, Officer Keenan pulled appellant’s left arm, “us[ing] the reasonable amount of *535 force necessary to ... get him to comply.” Officer Keenan could not “give ... an estimate[d] amount of time,” but said that “it took a little while to. get [appellant] off.” The baby was “on his back facing upward” when appellant released him. Officer Keenan noted that Koh refused medical treatment for the baby, stating that “the baby was fine.”[5]
At the close of the government’s case, the court said that it would draw an adverse inference that Ms. Robinson and Mr. Robinson “are biased against” appellant as a sanction for Ms. Robinson’s having discussed with Mr. Robinson, prior to his testimony, her own testimony about whether she was biased against appellant. The court found that the discussion violated its instruction that Ms. Robinson was not to discuss her testimony with anyone before the trial was over.[6]
After the court denied the defense motion for judgment of acquittal, the defense presented three witnesses. MPD Officer Rodd testified that he and Officer Keenan responded to the Robinsons’ home “within a few minutes” “from the time the call came in.” Upon arriving at the home, they saw members of the household around appellant yelling at him to let go of the baby. Appellant “had the .baby facing towards him sitting in a highchair and he was holding it crouching over[,j like leaning on the couch.” Asked whether appellant was “cradling the child,” Officer Rodd said that he “wouldn’t say cradling,” as appellant “was holding the child very tightly.” Appellant “seemed very agitated” and “didn’t want to let go of the baby,” and although the officers instructed him to let the child go, he did not do so until the officers forced him. The baby was crying hysterically when the officers entered the .house, to the point where Officer Rodd was concerned about the child’s well-being and safety because of “the position of [appellant] and the baby[J” To Officer Rodd’s knowledge, the child was “okay” when released. Officer Rodd testified that he did not see Koh, or any other person, under the highchair as it was lying on the couch.
Koh was the next defense witness. She testified that after appellant said he was going to take his son, appellant put “[h]is arms around the child” while the child was still in the highchair. Appellant fell on top of Koh after Mr. Robinson kept hitting appellant on the head. Koh told the court *536 that she believed 'appellant, who was “crouching down” with his face toward the baby, was holding the’baby “safely because he wasn’t crying.”- She testified that the baby did not begin to cry until the police arrived. She also testified that appellant did not refuse an instruction to let the baby go and that the police did not tell appellant to “get off the child” because they were “in the back behind him” and “ain’t even know” (presumably, whether appellant was on the child). Koh did not know how many “minutes or seconds” it took for the officers to get appellant to release the baby after they arrived. She acknowledged that she yelled for appellant to let go of the baby, but testified that she “knew he was not going to hurt the baby-’ and denied that appellant was putting his weight on the baby.
Finally, appellant testified on his own behalf. He testified that after Koh threatened to take the children to North Carolina, he went inside the house to get his son, and Koh began yelling, “Don’t take the baby.” Appellant testified that his intention was to pull the child out of the highchair and then leave, but that Ms. Robinson grabbed his arm, which he snatched away (according to appellant, “the only contact [he] made with [his] sister”). Appellant said that he took the child, who was “not strapped in,” out of the highchair and had the child against his chest, and that the women began pulling on the baby. Appellant thought the baby could get hurt from them pulling on him, so he “kind of held the baby more trying to get them to just stop.” He looked down at the baby, who was breathing and was “just there[,]” as if he “[m]aybe ... thought we were playing or something[.]” Mr. Robinson appeared and began punching appellant, “for some minutest-,]” and appellant’s “legs gave out and [he] just fell to [his] knees.” Appellant testified that while trying to understand why-the others were- beating on him and ‘punching his head while he had the baby,- he walked on his knees over to the couch and buried his head, as people continued to beat on him. He was “just trying to hold the baby so he didn’t get hit,” Appellant, with his head buried, knew that police officers had arrived only when they “did something” to his side to get him to release the baby. The baby had no injuries, and while appellant acknowledged that he heard his daughter crying during the incident[7] (and identified her as the person crying on the 911 recording that was admitted into evidence), he testified that the baby did not cry until the police took him away from appellant.
In announcing its findings of fact, the trial court stated that notwithstanding the evidence of Ms. Robinson’s bias against appellant, Ms. Robinson was a “very compelling and credible witness,” who “testified with a level of detail .., [and] demeanor that truly conveyed to th[e] court that she was telling ... the truth about the events.” As for Mr. Robinson, the court gave his testimony “less weight,” explaining that “[h]is memory seemed to be more faded than one would have expected regarding the events that had occurred ... [a]nd [he] didn’t seem to remember with specificity his own action[s][.]” The court found both police officers “to be, very credible witnesses” with no reason to be biased and gave their testimony “a lot of weight” despite “some inconsistencies” in the testimony. The court found Koh to be “a less credible witness,” who was not “[at *537 tuned] to what was happening around her[,] perhaps because she had already been involved in both a verbal and physical altercation with her husband”!;] the court gave her testimony “less weight.” In particular, the court found “not credible” Koh’s testimony that the baby was not crying until after the' police arrived, noting that the officers, “upon arriving on the scene while the events were still ongoing,” indicated that the baby was crying.
The court also found “wholly incredible” appellant’s testimony that the baby was not crying until after the police arrived. In light of Officer 'Rodd’s testimony that the baby was' still in the highchair when he arrived, the court also did not credit appellant’s testimony that the baby was not still in the highchair when appellant was holding him. Citing Officer Keenan’s testimony that she did riot see anyone’s hands on appellant when she arrived, the court did not credit appellant’s testimony that he was “just being pounded and pounded and beaten and that’s why he couldn’t rélease the baby[.]”[8] Further, the court did not credit appellant’s testimony that, during the incident, his primary concern was the baby’s safety. Instead, the court found, the “driving force” behind appellant’s action was his intent not to leave without the baby, and his “actions of not releasing the baby ... continued to place the baby at greater and greater risk of harm.”
The court found that the baby was strapped in the highchair shown iri the photograph admitted as Government Exhibit 2. Additionally, the court concluded:
I do find that the defendant grabbed the baby while the baby'was still in the high chair, never removing the baby from the high chair, grabbed the baby with a tight grip.. I do find that at one point the baby ended up under the upper body of the defendant leaning over — over a couch. The defendant’s weight was on some of the. baby. The baby was still in the high chair. And so the order it is the defendant’s on . top, the baby next, and then the high chair, and then the couch, in that order from top to bottom with the defendant pressing down on the baby holding the baby tightly. I do find that the baby was [exhibiting signs of distress by] hysterically crying and was terrified.
The court also found that appellant was holding his son “very tightly!,]” “in a tight grip with the son underneath his body!,] pinned between his body and the high chair on top of a couch,” a “dangerous position where the child was at a grave risk of harm for an extended period of time.” The court further found that appellant did not comply with the police officers’ order, given more than two times, to release the child and found it “wholly incredible” that appellant did not recognize that “these were now police officers” giving the order. Appellant’s non-compliance with the officers’ order, the court found, was “extremely dangerous” for “[a] baby who could do nothing to get himself out of this situation” and “who could easily be harmed!.]” The court found that:
[The] manner in which' [appellant] grabbed the baby, held the baby, continued to hold the baby in a tight grip leaning over the baby with his weight on the baby with the baby still strapped in the high chair and continuing to do so in this very dangerous and precarious position for many minutes even when the police arrived continuing to do so, de *538 spite being asked to let the baby go, it did create a grave risk of bodily harm.
After the court concluded the announcement of its findings, defense counsel asked the court to clarify its findings on several points, saying:
If the child was in the high chair and [the chair] kind of forms a plastic frame around the child, ... how is [appellant] able to possibly suffocate the child if the child has this plastic frame around himself[?] Even if [appellant] was close to him, it seems [the highchair] would have insulated the child from having any kind of problems.
Counsel also asked whether the court credited appellant’s testimony that he fell or tripped rather than “went down on the couch intentionally[.]” The court responded that counsel’s questions were “not key in any manner ... and that’s why [it] didn’t focus on them.” The court further responded that it did not matter whether appellant “tripped or went down on the couch on his own”; what mattered for the court was that while appellant “had the child gripped in a tight grip on top of the couch, he continued to grip that baby for many minutest,]” “while the baby was positioned on top of the couch underneath his weighty” “while he was repeatedly asked to let the baby go.” “[T]hat in, and of itself, caused a grave risk of harm to the baby.” The court said that it was not “making a specific finding whether the child was going to suffocate,” reasoning that “[tjhere could have been many ways the child could have been harmed under these circumstances because the defendant refused to release the baby. So I’m not here to make a physics [finding] as to whether the chair was providing sufficient protection [in order] to prevent suffocation[.]” Accordingly, the court found appellant guilty of attempted cruelty to children in the second degree.
II.
To prevail on a claim that the evidence was insufficient for conviction, an appellant “must establish that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt.” Russell v. United States, 65 A.3d 1172, 1176 (D.C.2013) (internal quotation marks omitted). When considering an insufficiency-of-the-evidence claim, “we view the evidence in the light most favorable to the government, giving full play to the right of the [factfinder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.” Medley v. United States, 104 A.3d 115, 127 n. 16 (D.C.2014) (internal quotation marks omitted). Almost without exception, “[t]he determination of credibility is for the finder of fact, and is entitled to substantial deference.” Bouknight v. United States, 867 A.2d 245, 251 (D.C.2005). “This court will not reverse a trial court’s factual findings after a bench trial unless those findings are plainly wrong or without evidence to support them.” Evans v. United States, 122 A.3d 876, 887 (D.C.2015) (internal quotation marks and alterations omitted).
The foregoing standard is “deferential,” Swinton v. United States, 902 A2d 772, 776 n. 6 (D.C.2006), but it is not a “rubber stamp,” id., and it is by no means “toothless.” Evans, 122 A.3d at 887. “[Although a [fact-finder] is entitled to draw a vast range of reasonable inferences from evidence, [the fact-finder] may not base a verdict on mere speculation.” Schools v. United States, 84 A.3d 503, 508 (D.C.2013) (internal quotation marks omitted). Moreover, “[t]he one exception to th[e] general rule [that the determination of credibility is for the finder of fact, and is entitled to substantial deference,] is if the *539 testimony of a witness is inherently incredible under the circumstances.” Robinson v. United States, 928 A.2d 717, 727 (D.C.2007). The “doctrine of inherent incredibility can be invoked only when the testimony can be disproved as a matter of logic by the uncontradicted facts or by scientific evidence; or when the person whose testimony is under scrutiny made allegations which seem highly questionable in light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave.” Payne v. United States, 516 A.2d 484, 494 (D.C.1986) (internal quotation marks and alterations omitted). Applying the doctrine of inherent incredibility, we may conclude that testimony credited by the trial court “should have been discredited” where it “contains internal contradictions!)]” Jackson v. United States, 353 F.2d 862, 867 (D.C.Cir.1965); see also id. at 867 n. 11 (explaining that in Farrar v. United States, 275 F.2d 868 (D.C.Cir.1959), the court “in effect used the inherently incredible doctrine ... in reversing a criminal conviction rendered by a judge”); Farrar, 275 F.2d at 869 (“It is nearly or quite incredible that appellant could have used a knife as extensively as the [witness] said he did without her ever seeing it. It is so nearly incredible that a reasonable inference, if not the only reasonable inference, from the testimony of the [witness] herself, is that appellant did not use a knife.”).[9]
“We must reverse a criminal conviction when it is clear to us that upon the evidence a reasonable mind must necessarily have had a reasonable doubt as to guilt.” Farrar, 275 F.2d at 870 (internal quotation marks and ■ alterations omitted).
III.
In this case, the trial court’s determination that appellant was guilty of attempted second-degree cruelty to children was premised on the court’s findings that appellant (1) held the baby, who was strapped in a highchair, in a “tight grip”; and (2) for many minutes, still “very tightly” gripping the baby, put his “weight on the baby” (or on “some of the baby”), with the child “pinned between his body and the high chair on top of a couch[.]” Appellant contends that these factual findings are clearly erroneous and “contrary to the physical evidence.” We agree; we do not defer to them because, as we explain below, the testimony on which they are based “can be disproved as a matter of logic by the uncontradicted facts[,]” Payne, 516 A.2d at 494 (internal quotation marks and alterations omitted), or because the findings “seem highly questionable in light of common experience and knowledge,”[10] id., or are based on “mere speculation.” Schools, 84 A.3d at 508 (internal quotation marks omitted).
We begin with the finding that appellant held the baby in a “tight grip.” As noted above, the court relied primarily on Ms. Robinson’s testimony, and it was Ms. Robinson who referred to appellant’s “tight *540 ... grip on the baby” during the incident. But this and other critical parts- of Ms. Robinson’s testimony are internally unsupported because Ms. Robinson admitted at the outset of her testimony that “you really couldn’t see the baby.”[11] She also testified, without contradiction, that she was standing behind appellant, from which position she could see his back and the back of his head.[12] In addition, Ms. Robinson testified that appellant had grabbed the highchair and had “a full high chair ... in his grasp” after he tripped. Her testimony begs the question of how she could have seen how tightly appellant was gripping the child when she was behind him, and the question of how tightly appellant could have been holding the child when he was also holding the highchair in 'which the child was seated. Moreover, only through pure speculation could one assume that appellant’s hold on the child during the many minutes of the incident was exactly like his hold on the child when he first attempted to lift him out of the highchair[13] (or, as our dissenting colleague speculates, that appellant “naturally would have been trying to tighten his hold” on the child or to “reinforce[e] his weight on the child-in-chair”, as the officers pulled at his arm to get him to release the child).
We conclude that Ms. Robinson’s testimony that appellant was holding the child in a “tight ... grip” was “disprove[d] .... as a matter of logic-by the uncontradicted fact[ ],” Jackson, 353 F.2d at 867, that she was not in a position to see (and thus lacked the capacity to perceive) appellant’s grasp on the child.[14] Not only is the trial court’s finding about appellant’s “tight grip” not supported by credible evidence, but also the court’s decision to credit Ms. Robinson’s testimony in toto is especially difficult to understand given the court’s prior determination that Ms. Robinson was biased against appellant, and given that Ms. Robinson seemed to want to testify to more than she actually saw (and to what Mr. Robinson saw, despite his contrary testimony).
Likewise with the trial court’s finding that appellant placed his weight on the baby. Ms. Robinson (and no one else[15]) *541 testified that “[t]he weight of [appellant’s] body was on the baby.” But from Ms. Robinson’s admitted vantage point behind appellant, she could not have , seen whether appellant’s weight was on the child (or whether the child was “pinned” between appellant and the highchair). Tellingly, the first time Ms. Robinson mentioned appellant’s weight, she started to say something and,then appeared to check herself: “His weight was on — could have — anything could have happened at that moment actually.” She did'not return to the subject of appellant’s weight on direct; only on redirect did she say that appellant’s “weight was on that baby.” But, again, Ms. Robinson had already admitted that she really couldn’t see the baby. She also acknowledged that she “couldn’t seé what [appellant] could see.” Moreover, Ms. Robinson failed to mention the critical fact, observed by Officer Keenan and credited by the court, that appellant had his “knees on the ground” with his torso (according to Officer Rodd’s credited testimony) “leaning on the couch,” a posture which necessarily would have caused appellant’s knees (and/or the couch) to bear a substantial portion of his weight[16] (and, as discussed below, that does not even take into account the frame of the highchair, which even Ms. Robinson acknowledged helped to protect the child .from appellant’s weight). For that.reason, Ms. Robinson’s testimony that appellant had his weight on the baby to a degree such that “the baby could have gotten really hurt badly” was a speculative “allegation[ ] which seem[s] highly questionable in light of common experience and knowledge[.]” Payne, 516 A.2d at 494 (internal quotation marks omitted). As the trial court made no finding that the child was at risk of suffocation and relied primarily on Ms. Robinson’s speculative testimony about appellant’s weight putting the *542 baby at risk of harm, to the extent the court did so, its finding that appellant “create[d] a grave risk of bodily harm” for the child is not supported by credible evidence.[17]
Further, having resolved the contradictory testimony by finding that the child was strapped in the highchair throughout the incident, the trial court failed to take into account the significance of the highchair frame and harness in (as defense counsel put it) “insulat[ing] the child from having any kind of problems.”[18] As depicted in Government Exhibit 2, the highchair has side arms and (consistent with common experience) appears to have a very narrow space between the arms for a toddler-sized seat. It also has a safety harness for securing the child in the cushioned seat. It seems likely, and consistent with common experience, that an adult who is on his knees and is leaning over a highchair (with his torso leaning on a couch) and who is pulling toward himself a child who is strapped in the highchair would have his forward motion impeded, and his body weight propped up, by the arms of the highchair; the space between the arms appears too narrow to allow the shoulders, chest, or torso of the adult to weigh on the child.[19] In addition, with the child strapped in the chair, it seems “highly questionable in light of common experience,” Payne, 516 A.2d at 494 (internal quotation marks omitted), that appellant could pull the child fully toward himself We cannot agree with the trial court that “the plastic frame around the child” or the other features of the highchair were not important factors for the court to consider in making its finding about whether appellant was holding the child in a “dangerous and precarious position” and placed the child at grave risk of harm.[20]
As described above, in finding that appellant created a grave risk of bodily harm to the child, the trial court emphasized that appellant continued to hold onto the child “even when the police arrived” and “despite being asked [by the officers] to let the baby go[.]” The court’s ruling implies that appellant’s failure to immediately release the child when ordered to do so by the police in and of itself created a grave risk of harm. However, the uncontradicted testimony was that, upon the officers’ arrival, “everyone” joined in telling the officers that they should not use a baton or mace because “it’s a baby under there.”[21] From their position upon entering the house, the officers could see the child, and Officer Keenan testified that she addressed the situation by “us[ing] the reasonable amount of force necessary to ... get [appellant] to comply.” The officer did not describe exactly what she did *543 (other than that she “was pulling, I believe, [appellant’s] left arm”), but Mr. Robinson testified that, without hurting the child, the police put “a little spoon ... thing under [appellant’s] arm” and “his arm popped up[.]” There was no additional testimony describing the “little spoon ... thing” or precisely how it worked.
To conclude upon the foregoing evidence that appellant’s failure immediately to comply with the officers’ orders amounted to attempted second-degree cruelty to a child, the trial court would have had to find that the police took action to separate appellant from the child that posed a grave risk of bodily injury to the child. However, the court made no such finding, and the record does not provide support for a finding, beyond a reasonable doubt, that appellant’s non-compliance with the officers’ orders placed the child at grave risk of bodily injury.[22]
IV.
Without adequate factual support for the findings about appellant’s holding his son in a “tight grip” and placing his “weight on the baby” or “pressing down on the baby”; without evidence that appellant’s failure immediately to comply with the officers’ orders that he release the child occasioned police action that put the child at grave risk of bodily injury; and without the trial judge having articulated (or ourselves identifying from the record) what other grave risk of harm to the child ensued from appellant’s conduct, we are unable to uphold the trial court’s verdict that, beyond a reasonable doubt, appellant committed attempted second-degree cruelty to children.
Wherefore, appellant’s conviction for attempted second-degree cruelty to children is

Reversed.

Dissenting opinion by Senior Judge FERREN.

. A person "commits the crime of cruelty to children in the second degree if that person intentionally, knowingly, or recklessly ... [m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child[.]” D.C.Code § 22-1101(b)(l) (2012 RepL). "[Proof] of second-degree cruelty to children is sufficient to convict a defendant of attempted second-degree cruelty to, children.” Smith v. United States, 813 A.2d 216, 220 (D.C.2002).

. For that conduct, appellant was charged with and convicted of simple assault. He does not challenge that conviction.

. Ms. Robinson was asked whether she could "see all of that from underneath them” when Koh was on her back, the highchair was on top of her, the baby was in the highchair, and appellant was on top of them with his back and the back of his head showing. Ms. Robinson answered, "You had to be in [the] position that I was in, yes.”

. Ms. Robinson had testified that Mr. Robinson "could see that the baby is there,” but Mr. Robinson testified that he "couldn’t understand where the baby was.”

. During re-direct, Officer Keenan, making use of a juror’s chair, demonstrated how appellant was holding the baby. The court described the demonstration as follows:
I guess I don't know that one can say whether or not there’s air [between the cushion and the officer’s body], but certainly one could characterize what the witness showed the [c]ourt is her body in the area of her arms from the lower chest to her stomach ... directly lying on top of the chair, that is making contact with the chair, there wasn’t a space visible between her body and that region and the cushion of the chair.
Observing that Officer Keenan’s demonstration had her "ninety degrees pretty much bent over ... this furniture piece,” defense counsel asked the officer, "So it wasn’t like [appellant] was laying flat out on top of the baby, smothering the baby, ... right?” ‘ Officer Keenan responded that there was "nothing there [presumably, nothing in her demonstration that stood in for the baby] so ... [she] did it to the best of [her] ability.”

. Appellant subsequently testified that he and his sister are "really estranged.” Ms. Robinson testified that she loves appellant, but, in response to a question from defense counsel about whether appellant had "exposed [her] for making up medical conditions that did not exist” (a matter about which appellant later testified), Ms. Robinson said that appellant's account was a "boldface lie” and that she could “bring medical records showing that [appellant] was escorted from the hospital by police officers because of the things that he was doing while he was there.”

. Appellant testified that he was in the process of adopting the little girl, Koh’s daughter, when the incident occurred.

. The court found, however, that Ms, Robinson tried “to physically pull [appellant] up and off the baby” and that Mr, Robinson, for several minutes, "struck [appellant] trying to get [him] to release the baby,”

. Cf. Davis v. Commonwealth, No. 1637-99-2, 2000 WL 1182013, 2000 Va.App. LEXIS 612 (Va.Ct.App, Aug. 22, 2000) (reversing conviction because the victim’s statements, such as her statement that the defendant "was dragging her by her feet while choking her,” contained "inherent inconsistencies” and were "internally self-contradictory and do not permit reconciliation of the differences”).

. Our dissenting colleague asserts that only this criterion for an "inherently credible" finding is relevant, but the "can be disproved as a matter of logic by the uncontradicted facts” criterion is equally, if not more, relevant.

. As described above, Ms. Robinson’s only - testimony about the "tight — grip” was, "You really couldn’t see the baby good, unless you knew the baby was there, you wouldn't have known that he had that tight of a grip on the baby.”

. Mr. Robinson, who according to Ms. Robinson was hitting appellant on "the back of his head,” similarly testified that he "couldn't see the baby.”

. No one has suggested that appellant’s action in the moment when he attempted to lift the child out of the highchair could support a charge or verdict of attempted second-degree cruelty to children.

. We acknowledge that Officer Rodd testified that appellant was holding the baby "very tightly[,]” but he did so to distinguish‘the way appellant was holding his son from “cradling,” which was how defense counsel characterized the manner in which appellant was holding the child: "I wouldn’t say cradling, he was holding the child very tightly.” Officer Rodd also testified that the child was “facing towards [appellant] sitting in a highchair and [appellant] was holding it crouching over like leaning on the couch;” It is unclear whether the officer's reference to “holding it” meant that appellant was holding the baby or the highchair; but, in either case, we find it difficult to understand how appellant could have been holding the str'apped-in child very tightly if the child- was actually sitting in the highchair, or if appellant was also holding the highchair itself.

.Specifically, the police provided no testimony that - appellant's weight was on the child. Officer Keenan testified that appellant had his "torso leaning over, the couch/’ and Officer Rodd testified that the child was "facing towards [appellant] sitting in a highchair and [appellant] was holding it crouching oyer like leaning on the couch.” The demonstration Officer Keenan provided on re-direct indicated only that appellant and his son were *541 touching (i.e., the court found that it could not see "space visible” between the officer’s body and "the cushion of the chair”), and the officer demurred that she had done the demonstration to the best of her ability given that there was "nothing there” (such as a baby, we presume) that would have allowed her to give a more true-to-life demonstration. Moreover, although Officer Keenan testified that she saw no highchair,- the court found to the contrary that the child remained strapped in the chair throughout the incident (a resolution of the witnesses’ conflicting testimony to which we "must defer,” McDaniel v. Brown, 558 U.S. 120, 133, 130 S.Ct. 665, 175 L.Ed.2d 582 (2010)). Thus, Officer Keenan’s demonstration did not simulate the facts as the court found them to exist. No one testified that appellant was “pressing down” on the child, as the court found.
Nor was there any evidence that the child had bruises, red marks, or any other evidence of physical injury that might have followed if appellant had rested his weight on, or had tightly gripped a part of, the child’s body, The government offers a third possible basis supporting the guilly verdict: emotional harm to the baby. However, while the court found that the child was “exhibiting signs of distress by hysterical crying,” the court made no findings as to emotional harm. As appellant notes, the baby’s hysterical crying could have been triggéred by the household members’ continuous yelling, Mr. Robinson’s repeatedly hitting appellant, or appellant's fall after being hit. The record does not support a finding beyond a reasonable doubt that appellant’s holding onto his son created a "grave risk” of emotional harm to the child.

. Appellant argues that ”[h]is knees could bear his entire weight.” Our dissenting colleague asserts that appellant "never raised the kn.ees-and-torso argument in the trial court,” but defense counsel did focus the court’s attention on appellant’s "prostrate position.” In any event, there is no question that appellant has properly raised a sufficiency of the evidence claim on appeal, and we are required to look at all the evidence (in the light most favorable to the government) to determine whether no reasonable mind could find him guilty beyond a reasonable doubt. In conducting that analysis, we cannot disregard the testimony about appellant’s body position, whether or not his trial counsel specifically called that issue to the trial court’s attention.

. The court’s vague assertion that ”[t]here could have been many ways the child could have been harmed under these circumstances" is unsupported by the record. The court did credit the evidence that the child was crying hysterically, but, again, it seems as likely ,as not that this was caused by the "lot of confusion going on at that time.” As appellant emphasizes, "there were four adult members of the household [including a roomer, who did not testify at trial] who contributed" to that confusion,

. The court remarked that the frame of the highchair was "not key in any manner[.]”

. Ms. Robinson herself admitted that, even as she perceived the events, the highchair protected the child: "Had the baby not been in the highchair, the baby could have gotten really hurt badly.”

. We need not defer to the unsupported legal determination that appellant engaged in "dangerous” conduct.

. Mr. Robinson testified that both his wife and appellant also told the officers to be careful because appellant had a back or neck injury.

. We also find no “viable alternative” basis in the record to support a finding beyond a reasonable doubt that appellant engaged in conduct that caused a grave risk of bodily injury to his son. Johnson v. United States, 426 F.2d 651, 654 (D.C.Cir.1970).