*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-FM-0770

JUDY CLEARY, APPELLANT,

V.

DOUGLAS H. CLEARY, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2019-DRB-003871)

(Hon. Deborah J. Israel, Trial Judge)

(Submitted March 12, 2024                    Decided July 18, 2024)

*Judy Cleary*, pro se.

*Marshall E. Yaap* was on the brief for appellee.

Before MCLEESE and DEAHL, *Associate Judges*, and WASHINGTON, *Senior Judge*.

DEAHL, *Associate Judge*: Judy Cleary sued Douglas Cleary for divorce and division of property, claiming that the two were common law married for a period of four-and-a-half months after they had been in a romantic relationship for several

years.[1]  The trial court granted summary judgment to Douglas after finding that Judy did not adduce evidence from which a reasonable factfinder could conclude that the two had in fact been common law married.  Judy now appeals.

We reverse.  The evidence raises genuine issues of material fact concerning whether Judy and Douglas were common law married.  Judy presented evidence that, after being in a romantic relationship and living with Douglas for several years, and after the couple was already engaged, Douglas propositioned Judy—"let's be common law married"—and Judy agreed.  If that conversation occurred as Judy described it, a factfinder could reasonably conclude given the circumstances of their relationship that the two had in fact agreed to be presently married at that time.  Whether that conversation actually occurred, as Judy posits, and what the parties intended their relationship to be at that time cannot be resolved as a matter of law.  Those are instead questions of fact that must be adjudged by a factfinder after hearing the relevant evidence.  We therefore reverse the trial court's grant of summary judgment and remand the case for a trial.

---

[1] Judy Cleary's legal name is Hyeon Ju Kim.  Because she filed the lawsuit under the name Judy Cleary, we refer to her by that name in this opinion.  For clarity, we refer to her and Douglas Cleary by their first names throughout this opinion.

## I. Factual and Procedural Background

We begin with Judy's account of her relationship with Douglas and how, in her view, the parties came to be common law married on a particular date in 2019. Notably, Judy was proceeding pro se and the trial court treated her sworn pleadings as evidence in the summary judgment record, without objection from Douglas, so we do likewise. *Pajic v. Foote Props., LLC*, 72 A.3d 140, 147 (D.C. 2013) ("[A] sworn complaint is tantamount to an affidavit and may therefore be sufficient to raise a genuine issue of fact." (quoting *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 26 (D.C. 1991))).

According to Judy, she and Douglas were in a romantic relationship for about a year before they began living together in late 2016. Over time they discussed getting married, and on April 30, 2019, Douglas proposed to Judy. Douglas's proposal came as a "complete shock" to Judy, and she initially suspected that he proposed to her so that she, a real estate agent, would help him buy another house that he was expected to close on in the near future. Shortly after their engagement, Judy and Douglas spoke on the phone with Judy's aunt and uncle and told them of the couple's plan to get married in the coming months. While Judy maintained that the couple planned to marry before the upcoming July 1 closing on what she described as "their marital home," they were also planning a subsequent celebration

with friends and family—she described it as a post-marriage "surprise wedding party"—on September 28, 2019.

But in the days after their engagement, Judy was feeling ambivalent about marrying Douglas. She was concerned about what she described as his habitual drinking, his continued child support and alimony payments stemming from a prior relationship, and his overall commitment to their relationship. According to Judy, on May 9, 2019, Douglas overheard her telling her aunt on a phone call that she was going to call off the engagement and break up with Douglas. Douglas then intervened to try to convince her to stay with him. Eventually, in an effort to convince Judy not to leave him, Douglas (in Judy's telling) said "let's be common law married," and she replied "OK." Judy then began using her marital name, Cleary, and Douglas "never objected." Judy acknowledged that Douglas did not introduce her to friends or family as his wife. Eventually, the couple broke up on September 24, 2019, four-and-half months after Judy posits that they were married.

For his part, Douglas did not dispute that he was in a years-long romantic relationship with Judy, lived with her for two-and-a-half years, and that the pair became engaged in 2019 (he quibbled with the April 30 engagement date, positing that they were not engaged until July). But Douglas flatly denied that the couple ever became common law married, and instead maintained that they had merely

gotten engaged in the months before their September breakup. Douglas neither admitted nor denied that he and Judy had a conversation about their relationship on May 9, nor whether he ever spoke the words "let's be common law married." If the conversation happened, he did not offer any alternative account of what was said during it.

Whether that conversation happened or not, Douglas insisted that the couple had only anticipated getting married at a later date, and he adduced a fair amount of evidence that Judy herself did not consider the couple to be married in the months after the purported May 9 conversation. Specifically, he supplied a text message that Judy had sent to him in June 2019, in which she had drafted a message for Douglas to send to a realtor. In that draft message, Judy referred to herself as Douglas's "girlfriend (soon to be fianc[ée])," and inquired about how she might be added to a deed on a house that Douglas owned, given "the different title ownerships for unmarried couples." Douglas also highlighted an email that Judy sent to a Tiffany & Co. employee in July 2019 in which she referred to a ring the couple had purchased as an "engagement ring."

After Judy and Douglas's romantic relationship ended in September 2019, Judy filed for legal separation, seeking spousal support and division of marital assets. Douglas responded that the pair was never married, and at the close of discovery,

Douglas moved for summary judgment. The trial court granted his motion, concluding that Judy had not offered evidence from which a reasonable factfinder could find any of the three requirements of a common law marriage, to wit: (1) that the two had agreed in unambiguous words in the present tense to be married; (2) that they entered into that agreement with the same level of commitment as spouses in traditional marriages; and (3) that they had subsequently cohabitated together. Judy now appeals.

## II. Analysis

We review rulings on motions for summary judgment de novo, considering the evidence in the light most favorable to the non-moving party and drawing all inferences in the non-moving party's favor. *Katz v. District of Columbia*, 285 A.3d 1289, 1301 (D.C. 2022). We will affirm only "if, after conducting an independent review of the record, we conclude that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Washington v. District of Columbia*, 137 A.3d 170, 173 (D.C. 2016). Conversely, "we will reverse a grant of summary judgment if, but only if, the record would permit a reasonable fact-finder to properly render a verdict in the non-moving party's favor." *Caesar v. Westchester Corporation*, 280 A.3d 176, 184 (D.C. 2022) (internal quotation marks omitted).

The District is part of a shrinking minority of jurisdictions that recognize common law marriages at all; just nine states and the District still recognize common law marriages. *Hogsett v. Neale*, 478 P.3d 713, 720 & n.6 (Colo. 2021) (en banc) (listing Colorado, Iowa, Kansas, Montana, New Hampshire, Oklahoma, Rhode Island, Utah, and Texas, as the nine states). And among that shrinking minority the District takes a particularly lenient approach to how such a marriage can be formed, while at the same time we have explained that "claims of common law marriage should be closely scrutinized." *Coates v. Watts*, 622 A.2d 25, 27 (D.C. 1993).

In the District, a common law marriage is created by parties who "cohabitat[e]" as spouses "following an express mutual agreement, which must be in words of the present tense, to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage." *Gill v. Nostrand*, 206 A.3d 869, 875 (D.C. 2019). "Although there is no set formula required for the agreement, the exchange of words must inescapably and unambiguously impl[y] that an agreement was being entered into to become [spouses] as of the time of the mutual consent." *Coates*, 622 A.2d 25 at 27 (internal quotation marks omitted). "An agreement 'to be married at an unspecified future time . . . is insufficient to establish the existence of a common law marriage.'" *Gill*, 206 A.3d at 875 (quoting *Coates*, 622 A.2d at 27).

A couple need not publicly hold itself out as married to be common law married in the District, nor must the couple have a reputation in the community as being married; those considerations are mere evidence of whether they in fact had the required express mutual agreement to be married. *See Gill*, 206 A.3d at 875 (listing elements of common law marriage, with the "general reputation regarding the parties' relationship" providing mere evidence of those elements). That stands in contrast to some other jurisdictions that treat holding out and reputation as married as firm requirements. *See, e.g.*, *In re Estate of Dallman*, 228 N.W.2d 187, 190 (Iowa 1975) ("'[H]olding-out' or open declaration to the public has been said to be the acid test [to prove a common law marriage]."). The express mutual agreement, with sufficient commitment plus cohabitation thereafter, is all that is required for a common law marriage in the District.[2] *Gill*, 206 A.3d at 875.

Contrary to the trial court's ruling, we conclude that Judy adduced evidence that, if credited, could lead a reasonable factfinder to conclude that she and Douglas were common law married. If Douglas and Judy had the conversation that Judy

---

[2] That might come as a surprise to some, and one could question the wisdom of the District's approach to common law marriage. But as a division of this court, we are in no position to second guess it. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court," where overruling our precedents "can only be accomplished by this court en banc.").

alleges they had on May 9, 2019, that conversation—in the surrounding context of their years-long romantic relationship—was sufficient to establish an (1) "express mutual agreement," in "the present tense," (2) "to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage."[3]  That leaves only the question of whether the couple (3) "cohabitated" thereafter, where the evidence was undisputed that the couple lived together for an additional four-and-a-half months, until September 24, after their purported May 9 agreement.  In the context of their relationship, that is sufficient evidence for a reasonable factfinder to conclude that they cohabitated.  We now elaborate on each of these three points.

## A. The Present-Tense Agreement to be Married

If Judy's account were credited, it supplied evidence of a present-tense agreement to be married.  Judy represented that on May 9, Douglas told her "let's be common law married," and she answered "OK."  Those words are capable of "inescapably and unambiguously imply[ing] that an agreement was being entered into to become" spouses at that very moment.  *Gill*, 206 A.3d at 875.  When

---

[3]  The trial court bifurcated the "express mutual agreement" inquiry into two parts: whether there was (1) an express mutual agreement to be partners (2) with the same commitment as those in a ceremonial marriage.  That strikes us as a helpful way of breaking down the analysis here, so we follow suit.

somebody says "let's *be* married"—like when they say "let's be going" or "let's be rational"—that at least facially appears to be an entreaty to do something right then and there.[4]  While the context obviously matters a great deal, the context here supports Judy's claim that, in light of the parties' years-long romantic relationship, their engagement, and Judy's cold feet, that conversation was an agreement to seal the deal.  So a reasonable factfinder could conclude that (1) Douglas's "let's be common law married" stated his intention not to wait any longer and to presently cement their anticipated marriage, and (2) Judy's agreement to that entreaty then manifested her mutual assent to that intention.  While Douglas and Judy did not have any traditional ceremony at that point, or exchange any vows, there is no "set

---

[4] "Let's be married," while quite the stilted phrase, is similar to a more familiar one: "let's be friends."  Now, if a stranger walks up to you on the street and says "let's be friends," and you agree, it is far from clear that you become friends in that moment as opposed to having made a commitment to become friends over time.  Similarly, if a long-term romantic partner sits you down and says, "let's just be friends," and you agree, that poses its own uncertainties as to whether you have become friends (though your romantic relationship seems to have come to an end).  We can save such questions for the philosophers, because here we are concerned only with what a reasonable factfinder might conclude.  And the relevant context is that Judy and Douglas were in a years-long romantic relationship, while living together, and in Judy's telling the couple was already engaged to be married at the time of the May 9 conversation and Douglas was trying to dissuade her from calling the whole thing off.  In that context, a reasonable factfinder could surely conclude that "let's be common law married" manifested a concrete intention to solidify their marriage right then and there.

formula" for how parties must manifest their mutual assent to be married in the moment. *Coates*, 622 A.2d at 27.

Consider *East v. East*, for example. 536 A.2d 1103 (D.C. 1988). In that case, the trial court found that a man named Paul became common law married to his long-time partner, Margaret, when, "at a dinner party," he purportedly declared: "From here on in, Margaret and I are married," and the couple lived together thereafter. *Id.* at 1104. Paul denied making any such statement; he testified that Margaret told guests that they had been married "by a justice of the peace" earlier that day, and he did not correct that falsehood "to avoid the embarrassment of revealing that Margaret was lying." *Id.* at 1104. But the trial court credited Margaret's account of the conversation,[5] and we upheld its determination that a common law marriage existed where Paul's disputed declaration was in the present tense. *Id.* at 1106. In doing so, we explained that "[t]he best evidence of an express agreement [to be married] is the testimony of the parties," and that when the parties disagree about what that agreement was, the case properly came down to "the trial

---

[5] Our opinion in *East* did not say whether any of the untold number of guests at the dinner party testified—it appears not, because that would bear mentioning— nor does it specify how, exactly, Margaret apparently manifested her mutual assent to Paul's declaration.

court's judgment as to the credibility of the witnesses." *Id.* at 1106 & n.2 (internal quotation marks omitted).

The lesson from *East* is that when two parties offer contradictory testimony about whether they expressly entered into a common law marriage, and about what words were spoken between them, that dispute will almost invariably come down to the respective credibility of the parties that must be assessed at a trial.[6] Vanishingly

---

[6] There may be times when one party's testimony will be "inherently incredible" in the sense that it could be "disproved as a matter of logic." *Slater-El v. United States*, 142 A.3d 530, 539 (D.C. 2016) (internal quotation marks omitted) (describing the circumstances under which a court can find witness testimony inherently incredible); *see also Stewart v. District of Columbia*, 290 A.3d 937, 942-43 (D.C. 2023) (per curiam) (describing the "rarely met standard" where one party's testimony "is blatantly contradicted by the record, so that no reasonable jury could believe it," for example by "a video tape that quite clearly demonstrates the falsity of a statement." (cleaned up)). But Judy's account was not inherently incredible, and Douglas had no smoking gun evidence that contradicted it. Douglas's best evidence was probably (1) the text message in which Judy directed Douglas to send an email to a realtor asking about "the different title ownerships for unmarried couples" in June 2019, (2) the fact that he and Judy did not broadly hold themselves out as married after May 9, and (3) Judy's July reference, in an email to Tiffany & Co., to an "engagement ring" they purchased. But if we draw all inferences in Judy's favor, as we must at this stage, that evidence is easy enough to reconcile with Judy's account: First, Judy knew that the couple did not yet have legal documentation memorializing their marriage in June 2019, so perhaps she simply wanted to get her name on the deed as though they were unmarried to avoid any dispute later on (so much for that). Second, perhaps Judy wanted to keep their marriage under wraps for a short period until they could celebrate it at the "surprise wedding party" later in the fall. Third, as Judy explained, the ring that Judy and Douglas had purchased from Tiffany & Co. was marketed as an engagement ring, as distinct from a wedding

few cases are fit for summary judgment where one of the would-be married parties indicates they will testify to what is, on its face, a present-tense mutual agreement to be married.[7]  Summary judgment will typically be appropriate only when there is no evidence of such an agreement, or truly irrefutable evidence to the contrary.  *See, e.g.*, *Yeh v. Hnath*, 294 A.3d 1081, 1085-86 (D.C. 2023) (grant of summary

---

band.  And as discussed below in part II.B., Judy presented plenty of her own evidence that the parties were in fact married.

[7] There is only one case where this court has upheld a grant of summary judgment despite one party's willingness to testify to a present tense mutual agreement to be married plus subsequent cohabitation, and it points in Judy's favor. In *Coates*, Coates testified that his (then-deceased) longtime partner asked him "to come live with her, and make our home together as long as we both shall live, until death do us part."  622 A.2d at 26 n.1.  We held that these, coupled with Coates's agremeent, were indeed "words of present agreement" to be married, but nonetheless upheld a grant of summary judgment against Coates for the discrete legal reason that the words were "spoken at a time when Coates was already married" to somebody else.  *Id.*  We have since held that *Coates*'s legal analysis on that point was wrong, and that a present tense agreement to be married may be effectual even if some legal impediment precluded the marriage at the time, so long as the impediment is later lifted and the cohabitation continues.  *In re Estate of Jenkins*, 290 A.3d 524, 531 (D.C. 2023) (explaining that *Coates* contravened *Thomas v. Murphy*, 107 F.2d 268 (D.C. Cir. 1939)).  But that is neither here nor there for our purposes, where there was never any legal impediment to Judy marrying Douglas.  Notably, but similarly irrelevant here, in *Jenkins* this court seemed to misdescribe the facts of *Coates* as a case in which Coates "had offered no evidence that he and [his paramour] '*had ever agreed, in words in the present tense*, to be married.'"  290 A.3d at 530 (quoting *Coates*, 622 A.2d at 26).  *Coates* said the opposite: that Coates had introduced evidence of words of a present tense agreement to be married, though it was ineffectual because he was still married to another at the time, and he failed to adduce evidence of such an agreement "after his divorce," i.e., "after [his] divorce removed the initial impediment" to their marriage.  622 A.2d at 26 & n.1.

judgment, unchallenged on appeal, was based on fact that "Yeh had failed to present any evidence of an express, present-tense mutual agreement," and had stated under oath in another case that "she did not consider herself married"). Because the trial court ruled as a matter of law without the benefit of hearing the parties' testimony, it was not in a position to assess which of them testified more credibly regarding the purported May 9 conversation.

In granting summary judgment for Douglas, the trial court seemed to fault Judy for failing to initially offer a verbatim account of their May 9 conversation, but she later cured any failing on that front. Prior to the court's grant of summary judgment Judy had simply described how Douglas, on May 9, "declared the parties to be common law married from henceforth," which the trial court opined fell short of specifying what Douglas "said to [her] that allegedly formed an express mutual agreement to be married." Perhaps the court was right about that as a descriptive matter—Judy had not purported to quote Douglas's exact words—but if that failure was a meaningful one, Judy remedied it in her motion for reconsideration. In that motion, she clarified that Douglas specifically said, verbatim and in quotation marks, "let's be common law married." The trial court ultimately considered that version of the conversation, and in denying Judy's motion for reconsideration, it still found this verbatim account wanting, describing it as "no . . . evidence of any kind that the Court was not already aware of."

The trial court alternatively reasoned that, even if the May 9 conversation had taken place exactly as Judy had represented it, "the agreement was not *mutual*" because Douglas did not understand them to be married at the time. But Douglas's ad hoc representations of what he understood at the time of that purported May 9 conversation cannot be credited at face value, absent hearing his live testimony. It is not even clear if Douglas admits or denies that the May 9 conversation took place; he offers only the legally conclusory assertions that he and Judy "never formed a common-law marriage" because they "never cohabited following an express mutual agreement . . . to be permanent partners." One party's mere denial of an intent to be married cannot defeat, as a matter of law, the other party's evidence that they did so intend, nor can their legally conclusory assertions that there was no marriage. Douglas's assertions simply raise a credibility question that would need to be assessed at trial after hearing live testimony. *East* is again instructive. In that case, recall that Paul denied ever declaring himself to be married to Margaret. 536 A.2d at 1104. He flatly "denied making any such declaration," *id.*, so like Douglas in this case, Paul perforce likewise denied making such a declaration with an intent to be presently married. Nonetheless, this court held that Paul's denials raised a question of credibility for the factfinder after hearing the respective parties' live testimony. *East* compels the same conclusion here.

## B. With the Same Commitment as Spouses in a Ceremonial Marriage

Judy also presented evidence from which a factfinder could reasonably conclude that she and Douglas, per their May 9 conversation, intended "to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage." *Gill*, 206 A.3d at 875. That is not so high a bar. Even ceremonial marriages can be quite impetuous and ill-considered; for just $80 the Little White Wedding Chapel in Las Vegas offers drive-thru weddings in its "Tunnel of Love Ceremony." www.alittlewhitechapel.com/shop/packages/drive-thru-95-5; https://perma.cc/X8BP-676D. The conversation Judy describes, in the context of her years-long romantic relationship and cohabitation with Douglas, would permit a reasonable factfinder to conclude that the pair had the same degree of commitment as spouses in a ceremonial marriage.

The trial court found to the contrary, stressing circumstantial evidence that belied such a commitment. For instance, the trial court stressed that Judy and Douglas kept separate bank accounts and generally lacked any serious "financial entanglement[s]." While that is surely some evidence that the parties did not have the requisite commitment, it is far from dispositive; it is not unusual for married couples to have separate bank accounts, especially when they are newly married.

The trial court also opined that Judy "produced no credible evidence" that she in fact held herself out as Judy Cleary.

But the trial court ignored circumstantial evidence supporting a finding that Judy and Douglas had longstanding entanglements and other features of a deeply committed couple. For example, Judy claims that the pair *did* have financial entanglements, in the form of a joint financial venture: Judo Investments LLC (with Judo serving as a portmanteau for Judy and Douglas). While it appears that Douglas set that company up as a sole proprietorship in his own name, Douglas had done that in secret, without Judy's knowledge, in her telling. Judy also registered the email address for that joint venture—with the handle "judocleary"—from which she corresponded with contractors, and which she continues to use. One of those contractors sent an email to that address in July 2019 which discussed "cases where there are two homeowners such as yourself and your husband Douglas Cleary." And Douglas himself, in another July 2019 email to the manager of a condo association in which he owned a property, wrote that "[i]n regards to Judy and the legal record of ownership, she has my full permission to communicate on my behalf. . . . *Judy has ownership interests that are our private business*." (emphasis added).

The trial court also did not account for the evidence that Judy and Douglas did in fact hold themselves out as married. Judy presented documentary evidence not

only that she used the Cleary surname in the months after her purported marriage to Douglas, but that others likewise called her by that surname. Such evidence included the aforementioned email from the contractor, which was addressed to "Judy Cleary," an August 2019 home improvement estimate from the same contractor prepared for "Judy Cleary," and a letter from the condo board of their rental property mailed to "Douglas & Judy Cleary" and which opened by addressing "Mr. and Mrs. Cleary." And regardless of this evidence, Judy's own proffered testimony that she went by Cleary and held herself out as Douglas's wife could not be so easily brushed aside. "At the summary judgment stage, the trial court does not make credibility determinations or weigh the evidence." *Katz*, 285 A.3d at 1301.

And as we have already stressed, "the best evidence" of whether the parties had the requisite commitment to form a common law marriage "is the testimony of the parties" themselves. *East*, 536 A.2d at 1006 n.2 (internal quotation marks omitted). This was effectively a swearing contest between Judy and Douglas, and *East* instructs trial courts to look to the parties' testimony first and foremost. *Id.* Judy sufficiently previewed testimony for the court that she and Douglas had the requisite commitment to be married at the time of their May 9 conversation; Douglas's bare denials cannot defeat the evidence in Judy's favor on summary judgment. Judy indicated that she would testify that she and Douglas had been discussing getting married for an extended period of time. She claimed Douglas

then, post-engagement, overheard her talking to her aunt and saying she was thinking of leaving him, and that the two then discussed "ending their engagement and breaking up" across the rest of the day, with Douglas eventually proposing to marry her right then "to convince her not to break up" with him. If a factfinder had credited her testimony after hearing Judy and Douglas testify under oath, a reasonable factfinder could conclude that they in fact had the requisite commitment to be married.

### C. Cohabitation After the Agreement to Marry

We also disagree with the trial court that Judy and Douglas's four-and-a-half months of cohabitation following their alleged marriage agreement was insufficient to establish the cohabitation requirement of a common law marriage. While that cohabitation was surely briefer than that in most marriages, when coupled with the years they had lived together beforehand, it was more than sufficient to satisfy the cohabitation prong when interpreting the facts in the light most favorable to Judy.

This court has never clearly defined what it means to cohabitate in the context of a common law marriage. Dictionary definitions do not shed much light on the subject, as they tend to collapse this third requirement into the first two, asking whether the parties lived together in an arrangement that mirrors that of spouses. They define "cohabit" as meaning "to live together as or as if as husband and wife,"

Webster's Third New International Dictionary 440 (2020), and "cohabitate" as the "fact, state, or condition of living together, esp[ecially] as partners in life, usu[ally] with the suggestion of sexual relations," Black's Law Dictionary 316 (10th ed. 2014). Common law definitions from other jurisdictions use roughly the same concepts to define cohabitation as living together as, or as if, spouses.[8]

Under any of those definitions, Judy supplied evidence that, if credited, she and Douglas cohabitated after they purportedly agreed to be married on May 9. As the trial court explained, it was undisputed that the parties lived together from roughly December 2016 through September 2019, and the parties had an "intimate

---

[8] The Supreme Court of New Hampshire, in *In re Raybeck*, 44 A.3d 551, 554-55 (N.H. 2012), provides this helpful representative sample of authorities as examples, albeit in the different context of assessing when alimony can be modified on the basis of cohabitation with another by the recipient spouse: *State v. Arroyo,* 435 A.2d 967, 970 (Conn. 1980) ("[Cohabitation] is the mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations."); *Cook v. Cook*, 798 S.W.2d 955, 957 (Ky. 1990) (cohabitation is "mutually assum[ing] the duties and obligations normally assumed by married persons"); *Fisher v. Fisher*, 540 A.2d 1165, 1169 (Md. Ct. Spec. App. 1988) (cohabitation "envisions at least the normally accepted attributes of a marriage"); *Frey v. Frey*, 416 S.E.2d 40, 43 (Va. Ct. App. 1992) (cohabitation "has been consistently interpreted by courts as encompassing both a permanency or continuity element and an assumption of marital duties"); 27B C.J.S. *Divorce* § 656, at 334 (2005) ("Generally," "cohabitation is an arrangement in which the couple reside together on a continuing conjugal basis or hold themselves out as man and wife," adding that the "court must look to whether the parties have assumed obligations, including support, equivalent to those arising from a ceremonial marriage").

involvement" throughout that time. And for reasons we have largely articulated in the previous two subparts of this opinion, a reasonable factfinder could conclude that when they continued living together after May 9, they were living "as if as husband and wife." Webster's Third, *supra*, at 440.

In reaching its contrary conclusion, the trial court stressed that Judy and Douglas in fact only lived together for four-and-a-half months after the purported May 9 agreement, which the trial court likened to "sharing bed and board for a brief period." While that severely understates the undisputed nature of Judy and Douglas's years of living together as a couple, even that four-and-a-half month timeframe by itself would likely permit a reasonable factfinder to conclude that the pair cohabitated during that stretch. *See Bansda v. Wheeler*, 995 A.2d 189, 198 (D.C. 2010) (describing four months of living together as "cohabitation," albeit insufficient of itself to establish a common law marriage absent the "express mutual agreement" discussed in Part II.A above). Marriages can of course be short-lived, and under no reading of the evidence were Judy and Douglas mere roommates.

Moreover, the trial court was too narrowly focused on the post-May 9 timeframe alone when assessing the cohabitation question. The fact that Judy and Douglas had lived together for years prior to that—even if they were not cohabitating as spouses during that stretch of years—was highly relevant to whether they

cohabitated after May 9, but the trial court seemed to discount that fact entirely. For instance, imagine that you lived with a romantic partner for fifty years, up until New Years Day of 2024, before you unexpectedly parted ways in old age. If somebody asked you whether you cohabitated with your partner after mid-August 2023, that would pose an easy question: Of course you did. You cohabitated for an additional four-and-a-half months thereafter. The cohabitation question might be quite a bit harder if somebody asked you if you cohabitated during the first four-and-a-half months of living together, dating back to 1974, when your relationship was still nascent. That is essentially how the trial court, mistakenly in our view, analyzed the cohabitation question here without accounting for Judy and Douglas's longstanding arrangement of living together.

Finally, the trial court placed undue emphasis on the fact that Judy and Douglas spent most of the post-May 9 period living in a home that Douglas owned in his own name and another stretch of it living in a friend's house while Douglas's house underwent renovations. We simply do not find those facts particularly relevant. Married couples often live in a house titled in only one spouse's name, particularly when that spouse owned the home prior to their marriage. *See, e.g.*, *Bansda*, 995 A.2d at 193 (describing married couple who lived in house that was titled solely in husband's name before their marriage); *Macklin v. Johnson*, 268 A.3d 1273, 1277 (D.C. 2022) (same). And it is likewise not unusual for even married

couples to temporarily live with friends during extenuating circumstances, such as when their home is undergoing renovations.

*                        *                        *

At bottom, Judy presented evidence on all three of the requirements of a common law marriage that would permit a reasonable factfinder to conclude that she and Douglas were common law married after May 9. That evidence raises intensely factual questions that simply cannot be resolved as a matter of law, but are inextricably bound up with the credibility of Judy's and Douglas's competing accounts, which must be vetted by a factfinder after a trial.

### III. Conclusion

For the foregoing reasons, we reverse the trial court's grant of summary judgment and remand for a trial.

*So ordered.*